Thomas P. Mazzucco - 139758
Aaron K. McClellan – 197185
Bryan L. P. Saalfeld - 243331
Nicholas C. Larson - 275870
MURPHY, PEARSON, BRADLEY & FEENEY
88 Kearny Street, 10th Floor
San Francisco, CA 94108-5530
Tel: (415) 788-1900
Fax: (415) 393-8087
E-Mail tmazzucco@mpbf.com
amcclellan@mpbf.com
bsaalfeld@mpbf.com
nlarson@mpbf.com

Geoffrey Potter (to be admitted *pro hac vice*)
Christos G. Yatrakis (to be admitted *pro hac vice*)
Jonah M. Knobler (to be admitted *pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222
E-Mail gpotter@pbwt.com
cyatrakis@pbwt.com
jknobler@pbwt.com

Attorneys for Plaintiffs
Innovation Ventures, LLC and Living Essentials, LLC

SEALED BY COURT ORDER

FILED OCT 26 2012

6

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

WHA

INNOVATION VENTURES, LLC and LIVING ESSENTIALS, LLC,
Plaintiffs,

-against-

PITTSBURG WHOLESALE GROCERS, INC., d/b/a PITCO FOODS; PACIFIC GROSERVICE, INC. d/b/a PITCO FOODS; ARISTOTLE PERICLES NAVAB; DAVID LUTTWAY; SANTA MONICA DISTRIBUTING, INC.; MANOUCHEHR HEIKALI, a.k.a. DAVID HEIKALI; ASIS HEIKALI, a.k.a ED HEIKALI; ELITE WHOLESALE, INC.; TONIC WHOLESALE, INC. d/b/a ACE WHOLESALE; KOAMEX GENERAL WHOLESALE, INC., YOUNG H. KIM, a.k.a. YONG HWAM KIM; JA HO LEE; FONTIER WHOLESALE; PRINCIPAL; DAN-DEE COMPANY, INC.; PRINCIPAL; and JOHN DOES 1-10,
Defendants.

Case No. C 12 5523

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, EX PARTE SEIZURE ORDER, EXPEDITED DISCOVERY, AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

ARGUMENT ..... 8

I. PLAINTIFFS ARE ENTITLED TO IMMEDIATE INJUNCTIVE RELIEF ..... 8

A. Plaintiffs Have a Strong Likelihood of Success on the Merits ..... 8

B. Plaintiffs Are Suffering Irreparable Harm As A Result of Defendants' Activities ..... 10

C. The Balance of Equities Tips Decisively in Living Essentials' Favor ..... 11

D. An Injunction is in the Public Interest ..... 12

E. At a Minimum, There are Serious Questions Going to the Merits and the Balance of Hardships Decidedly Favors Plaintiffs ..... 12

II. PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* ORDER FREEZING THE DEFENDANTS' ASSETS ..... 13

III. PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* SEIZURE ORDER OF ALL COUNTERFEIT 5-HOUR ENERGY PRODUCTS AND ALL RECORDS DOCUMENTING THE MANUFACTURE, SALE OR RECEIPT OF THOSE COUNTERFEIT GOODS ..... 15

A. An order other than an *ex parte* seizure order is not adequate to achieve the purposes of the Lanham Act (15 U.S.C. § 1116(d)(4)(B)(i)). ..... 16

B. Plaintiffs have not publicized the requested seizure (15 U.S.C. § 1116(d)(4)(B)(ii)). ..... 17

C. Plaintiffs are likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services (15 U.S.C. § 1116(d)(4)(B)(iii)). ..... 17

D. An immediate and irreparable injury will occur if such seizure is not ordered (15 U.S.C. § 1116(d)(4)(B)(iv)). ..... 17

E. The matter to be seized will be located at the place identified in the application (15 U.S.C. § 1116(d)(4)(B)(v)). ..... 18

F. The harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application (15 U.S.C. § 1116(d)(4)(B)(vi)). ..... 18

G. Defendants would be likely to destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person (15 U.S.C. § 1116(d)(4)(B)(vii)). ..... 18

Case3:12-cv-05523-WHA Document6 Filed10/26/12 Page3 of 29

IV. PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY....................20

CONCLUSION....................23

-iii-

5685695v.1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ....................13

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) ....................9

*Apple Computer, Inc. v. Formula Int'l Inc.*,
725 F.2d 521 (9th Cir. 1984) ....................10

*Benham Jewelry Corp. v. Aron Basha Corp.*,
No. 97 Civ. 3841, 1997 U.S. Dist. LEXIS 15957 (S.D.N.Y. Oct. 14, 1997) ....................21

*Brookfield Commc'ns Inc. v. W. Coast Entm't, Corp.*,
174 F.3d 1036 (9th Cir. 1999) ....................8, 9

*Burger King Corp. v. Stephens*,
No. Civ. A. 89-7691, 1989 WL 147557 (E.D. Pa. Dec. 6, 1989) ....................12

*Chanel, Inc. v. Unincorporated Assoc.*,
No. 2:11-cv-03780-GAF-PJW, 2011 U.S. Dist. LEXIS 91376 (C.D. Cal. Aug. 15, 2011) ....21

*Cytosport, Inc. v. Vital Pharmas., Inc.*,
617 F. Supp. 2d 1051 (E.D. Cal. 2009) *aff'd* 348 F. App'x 288 (9th Cir. 2009).........10, 11, 12

*Dell Inc. v. BelgiumDomains, LLC*,
No. 07-22674 ....................21

*Ellsworth Assocs., Inc. v. United States*,
917 F. Supp. 841 (D.D.C. 1996) ....................22

*Federal Express Corp. v. Federal Espresso, Inc.*,
No. 97 CV 1219, 1997 WL 736530 (N.D.N.Y. Nov. 24, 1997) ....................22

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*,
955 F.2d 1143 (7th Cir. 1992) ....................9, 10

*Hunting World, Inc. v. Reboans, Inc.*,
Civ. A. No. C 92 1519 BAC, 1992 U.S. Dist. LEXIS 21477 (N.D. Cal. Apr. 21, 1992)........21

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*,
No. 04 Civ. 4186, 2007 U.S. Dist. LEXIS 7880 (N.D. Cal. Feb. 2, 2007) ....................9

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
51 F.3d 982 (11th Cir. 1995) ....................14

*Lorillard Tobacco Co. v. Montrose Wholesale Candies*, No. 03 C 4844, 2005 U.S. Dist. LEXIS 28917 (N.D. Ill. Nov. 8, 2005) ....14

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) ....8

*Multi-Local Media Corp. v. 800 Yellow Book Inc.*, 813 F. Supp. 199 (E.D.N.Y. 1993) ....8

*Pepsico, Inc. v. Plank*, No. CV 02-02476 NM ....21

*Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119 (C.D. Cal. 2007) ....10

*Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067 (C.D. Cal. 2003) ....9

*Pod-Ners, LLC v. Northern Feed & Bean*, 204 F.R.D. 675 (D. Colo. 2002) ....22

*Procter & Gamble Co. v. Quality King Distribs., Inc.*, 123 F. Supp. 2d 108 (E.D.N.Y. 2000) ....9

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552 (9th Cir. 1992) ....14, 16

*Republic of the Phillipines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (en banc) ....14

*S.E.C. v. International Swiss Investments Corp.*, 895 F.2d 1272 (9th Cir. 1990) ....15

*Sanrio Co. v. JIK Accessories*, No. C-09-0440 EMC, 2012 U.S. Dist. LEXIS 55280 (N. D. Cal. Apr. 19, 2012) ....10, 11

*Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273 (N.D. Cal. 2002) ....21

*Sony Computer Entm't Am., Inc. v. GameMasters*, 87 F. Supp. 2d 976 (N.D. Cal. 1999) ....21

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004) ....9

*Tiffany (NJ) LLC v. Forbse*, No. 11 Civ. 4976 (NRB), 2012 U.S. Dist. LEXIS 72148 (S.D.N.Y. May 23, 2012) ....15

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473 (S.D.N.Y. 1990) ....22

*United States v. Int'l Bhd. of Teamsters*,
266 F.3d 45 (2d Cir. 2001)....................15

*Ventura Travelware, Inc. v. A to Z Luggage Co.*,
No. 86 CV 13, 1986 U.S. Dist. LEXIS 18022 (E.D.N.Y. Nov. 6, 1986) ....................11

*Wangson Biotech. Grp. v. Tan Tan Trading Co.*,
No. C ....................19

*Winter v. Natural Res. Def. Council*
555 U.S. 7 (2008)....................8

**STATUTES**

15 U.S.C. § 1116(d) .................... 1, 2, 16-21

18 U.S.C. § 2320....................19

28 U.S.C. § 1657....................20

28 U.S.C. § 1651 ....................21

17 U.S.C. § 106....................2

15 U.S.C. § 1117....................14

15 U.S.C. § 1114....................2

Case3:12-cv-05523-WHA Document6 Filed10/26/12 Page7 of 29

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER, *EX PARTE* SEIZURE ORDER, EXPEDITED DISCOVERY, AND PRELIMINARY INJUNCTION**

Plaintiffs Innovation Ventures LLC and Living Essentials LLC (collectively, "Living Essentials" or "Plaintiffs"), submit this memorandum of law in support of their application for an Order to Show Cause seeking a temporary restraining order, an asset freeze order, an *ex parte* seizure order pursuant to the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116, and a preliminary injunction to prevent the defendants from continuing to distribute and sell counterfeit 5-hour ENERGY® dietary supplements. By this application, Plaintiffs also seek an order authorizing limited expedited discovery so that they can find others involved in this unlawful counterfeiting scheme to shut it down as quickly as possible. All of these orders are routinely granted by Courts on the *ex parte* application of victims of counterfeiting schemes. Just yesterday, Judge Matsumoto of the Eastern District of New York granted Living Essentials the very relief it requests from this Court today against a different set of defendants selling counterfeits as part of the same criminal conspiracy. *See* Exhibit A (Signed Order to Show Cause, No. 12 Civ. 5354 (E.D.N.Y.) dated October 25, 2012); Exhibit B (Signed Seizure Order, No. 12 Civ. 5354 (E.D.N.Y.) dated October 25, 2012).

**PRELIMINARY STATEMENT**

This is an anti-counterfeiting action against those that manufacture, distribute and sell counterfeits of Living Essentials' 5-hour ENERGY®, the world's best-selling energy dietary supplement. With annual retail sales in excess of $1 billion, 5-hour ENERGY® is used regularly by millions of consumers. Unfortunately, Living Essentials has recently discovered that those consumers are being exposed to unlawful, misbranded counterfeits being sold nationwide, including at numerous retail locations in this District.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, EX PARTE SEIZURE ORDER, EXPEDITED DISCOVERY, AND PRELIMINARY INJUNCTION
1

The counterfeiters have carefully and faithfully reproduced the authentic packaging, including accurate reproductions of Living Essentials' trademarks and copyrighted text. Only with a close and meticulous inspection can the counterfeit packaging be distinguished from the authentic. However, the liquid held within the counterfeit packaging can easily be distinguished from the authentic dietary supplement by its unpleasant odor, taste and color. Consumers have complained about the counterfeit product's taste and efficacy. Laboratory analysis has proved that the counterfeits are made from a different recipe that lacks essential active ingredients. Moreover, the conditions under which the criminal counterfeiters manufacture their product and the ingredients they use are unknown.

To put an immediate and permanent end to this brazen and potentially dangerous conduct, Living Essentials brings this anti-counterfeiting action for injunctive and monetary relief for trademark infringement in violation of the Lanham Act (15 U.S.C. §§ 1114 & 1125), the Copyright Act of 1976 (17 U.S.C. § 106), and California law. As explained below, and consistent with the past practices of victims of counterfeiting in this District and across the country, Living Essentials seeks four types of immediate relief. First, Living Essentials seeks a temporary restraining order and preliminary injunction preventing the defendants, all of whom have marketed or sold counterfeits, from continuing to do so. Second, Living Essentials seeks an order freezing the assets of the corporate defendants, who are believed be actively involved in the distribution of counterfeit products. Third, Living Essentials seeks *ex parte* seizure orders for these defendants, as is authorized by the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d)(1). Finally, Living Essentials seeks an order granting limited expedited discovery from the defendants so that it may quickly investigate and pursue the other participants in what is by all appearances a sophisticated nation-wide counterfeit operation.

## STATEMENT OF FACTS[1]

Since 2004, Living Essentials has owned, manufactured, and distributed a dietary supplement formulated from a proprietary recipe of vitamins and amino acids called 5-Hour ENERGY®. This supplement, which is sold as a liquid in 1.93-ounce bottles at more than 100,000 retail locations in the United States, has been tremendously successful. (Dolmage Decl. ¶ 1.)

Millions of people use this best-selling dietary supplement to boost their energy. On the average, more than 9 million bottles are sold each week. Total annual retail sales are in excess of one billion dollars. To date, a total of over 1.5 billion bottles of 5-Hour ENERGY® have been manufactured and sold by Living Essentials. (Dolmage Decl. ¶ 1.)

All authentic 5-Hour ENERGY® is manufactured, under strict quality control, according to a specific and consistent formula at two factories located in Wabash, Indiana. These state-of-the-art facilities owned and operated by Living Essentials are regulated by the United States Food and Drug Administration ("FDA") and subject to FDA inspection and Good Manufacturing Practices. (Dolmage Decl. ¶ 2.)

Living Essentials has invested more than $500 million advertising 5-hour ENERGY® in bottles and packaging that are covered with its famous family of trademarks including:

- 5-HOUR ENERGY® (Principal Reg. No. 4,004,225);

[1] The facts summarized below are set forth in detail in the accompanying declarations (with annexed exhibits) of Matthew S. Dolmage, Plaintiffs' Chief Financial Officer, dated October 25, 2012 ("Dolmage Decl."); Bruce Gerstman, an investigator employed by Kroll, dated October 25, 2012 ("Gerstman Decl."); Josh Lichtman, an investigator employed by Kroll, dated October 25, 2012 ("Lichtman Decl."); Brant Tinsley, an investigator employed by Kroll, dated October 25, 2012 ("Tinsley Decl."); Erich Speckin, a forensic scientist with Speckin Forensics LLC, dated October 25, 2012 ("Speckin Decl."); and the declaration of Geoffrey Potter, outside counsel to Plaintiffs, dated October 25, 2012 ("Potter Decl.")

- 5-hour ENERGY (Principal Reg. No. 4,104,670);
- 

(Principal Reg. No. 4,116,951);
- (Principal Reg. No. 3,698,044) (commonly referred to as "Running Man"); and
- 
(Principal Reg. No. 4.120,360) (collectively, the "5-hour ENERGY® Marks"). (Dolmage Decl. ¶¶ 1, 10.)

Living Essentials also own United States Copyright Registration Number TX 6-833-514 for the "Caution" label it uses on its products. (Dolmage Decl. ¶ 12.)

In late September 2012, Living Essentials was contacted by a salesman who suspected that he had encountered bottles of 5-Hour ENERGY® that had been diverted. Living Essentials examined the bottles and determined — to its horror — that they were fakes. (Dolmage Decl. ¶ 3.) Subsequent investigations by Living Essentials have revealed that these counterfeits are being sold at locations throughout the United States, including in the Northern District of California. *See* Declarations cited in footnote 1, *supra*.

Although the authentic and counterfeit products appear similar at first glance, a close inspection reveals numerous differences. (Dolmage Decl. ¶ 5; Speckin Decl. ¶¶ 17-24.) For example:

- The counterfeit bottles are slightly shorter than the authentic bottles.
- The label of the Extra-Strength Berry flavor of the counterfeit product contains a typographical error on its label in the list of ingredients. The words "Artificial Flavors" in the list of ingredients are misspelled on the counterfeits as "Art ficial Flavors."

- While all authentic bottles are sealed with bottle caps that have a small sprue in the middle of the top of the cap which is formed by the authentic injection molds, counterfeit bottle caps are smooth and have no sprue. Because this sprue on the authentic cap appears in the center of the "Running Man" mark, it is often referred to as the "belly button."

Pimple mark
from the mold
No pimple mark
Authentic Bottle
Top surface of cap
Counterfeit Bottle
Top surface of cap

- The caps of the authentic bottles feature Living Essentials' "Running Man" logo, a silhouette of a man running. The caps of the counterfeit bottles feature a slightly fatter silhouette of a man running.

- Although authentic 5-Hour ENERGY® comes in various flavors, including Berry, Orange, and Extra-Strength Berry, the liquid inside the bottle is always the same pale pink color. By contrast, the liquid inside the counterfeit bottles is strikingly different from one flavor variety to the next — and the counterfeit Orange and Extra-Strength Berry varieties are strikingly different in color from the corresponding varieties of the authentic product. For example, the counterfeit Extra Strength is colored orange, a color that Living Essentials does not have in its factories.

- The counterfeit product does not taste and smell the same as the genuine product, a fact that has been noticed by a number of consumers of 5-Hour ENERGY® who have contacted Living Essentials under the impression that they purchased defective product.

- Forensic analysis has determined that, unlike genuine 5-Hour ENERGY®, which contains 8333% of the RDI of vitamin $B_{12}$, the counterfeit product contains *no* detectable vitamin $B_{12}$ — notwithstanding that the counterfeit product's label claims to contain the same amount of vitamin $B_{12}$ as the authentic product.

- Forensic analysis has determined that the dyes used to print the boxes in which the counterfeit product is distributed are chemically different from the dyes used to print authentic 5-Hour ENERGY® boxes.

Below are photographs comparing the authentic and counterfeit bottles:



No mold mark
"Dimple" mold mark
Cap top
Cap top
shorter by several millimeters
Counterfeit
Authentic

5685695v.1

## ARGUMENT

## I.

## PLAINTIFFS ARE ENTITLED TO IMMEDIATE INJUNCTIVE RELIEF

"Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty in proving monetary damages." *Multi-Local Media Corp. v. 800 Yellow Book, Inc.*, 813 F. Supp. 199, 202 (E.D.N.Y. 1993). Here, Plaintiffs seek a temporary restraining order to ensure that evidence of defendants' dealings in counterfeit 5-hour ENERGY® (including the counterfeit product itself) is preserved. To obtain such relief, Plaintiffs must demonstrate "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009). Plaintiffs easily meet all of those elements and therefore are entitled to immediate injunctive relief.

### A. Plaintiffs Have a Strong Likelihood of Success on the Merits

Among other claims, Plaintiffs have alleged various causes of action against Defendants for violating Plaintiffs' trademark rights under federal and state law. Plaintiffs can prevail on their trademark claims by showing that defendants are using a mark confusingly similar to one of Plaintiffs' valid, protectable trademarks. *See Brookfield Commc'ns Inc. v. W. Coast Entm't, Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).

Plaintiffs can clearly make that showing here. As described above, Living Essentials owns valid trademarks for the products at issue. (Dolmage Decl. ¶ 10.) Defendants are "using" those marks by selling counterfeit 5-hour ENERGY® products in counterfeit packages that are nearly identical to genuine 5-hour ENERGY® packaging. Living Essentials has purchased

counterfeit product either directly from each defendant itself or from retailers that purchased 5-hour ENERGY® from a defendant. *See* Declarations cited in footnote 1, *supra*; Cplt ¶¶ 59-78.

Because defendants have sold counterfeit 5-hour ENERGY® products intended to look exactly like the genuine products, likelihood of consumer confusion is established as a matter of law. Although likelihood of confusion is normally judged based on the multi-factor analysis set out in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), this analysis is unnecessary "in cases involving counterfeit marks . . . because counterfeit marks are inherently confusing." *Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2003); *see also Brookfield Commnc'ns*, 174 F.3d at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course."); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, No. 04 Civ. 4146, 2007 U.S. Dist. LEXIS 7880 (N.D. Cal. Feb. 2, 2007) (noting that where the mark used by the defendant is "the same as, or substantially indistinguishable from" plainiff's mark, "a likelihood of confusion is established" if the products defendants dealt in were not genuine); *Procter & Gamble Co. v. Quality King Distribs., Inc.*, 123 F. Supp. 2d 108, 115 (E.D.N.Y. 2000) ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety.'" (citation omitted)).

Notably, trademark infringement is a strict liability offense. *See Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073-74 (C.D. Cal. 2003) ("[I]gnorance is no defense to violations of the Lanham Act."); *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("[I]t is well established that wrongful intent is not a prerequisite to an action for trademark infringement . . . and that good faith is no defense." (citations and internal quotations omitted)); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992) ("Sellers bear strict liability for violations of the Lanham Act."). Therefore, defendants are liable

under the Lanham Act regardless of whether they were aware of the counterfeit nature of the products they sold. *Id.*; *see Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1122 (C.D. Cal. 2007). Because defendants sold counterfeits, Living Essentials' Lanham Act claims are not merely likely, but virtually certain, to succeed.

**B. <u>Plaintiffs Are Suffering Irreparable Harm As A Result of Defendants' Activities</u>**

Where, as here, a Lanham Act plaintiff has succeeded in showing a likelihood of confusion, irreparable injury "almost inevitably follows." *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971). The reason is simple: an infringer selling an inferior product destroys good will associated with the plaintiff's mark that cannot be recovered or compensated for. *See Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (noting that "loss of control over [plaintiff's] reputation and loss of goodwill" is sufficient to demonstrate irreparable injury for purposes of preliminary injunction application in trademark infringement claim); *Sanrio Co. v. JIK Accessories*, No. C-09-0440 EMC, 2012 U.S. Dist. LEXIS 55280, at *14 (N. D. Cal. Apr. 19, 2012) (finding that continued sale of counterfeits would likely cause irreparable harm because it would damage plaintiff's goodwill and reputation); *Cytosport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) ("Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.") *aff'd*, 348 F. App'x 288 (9th Cir. 2009); 5 J. Thomas McCarthy, McCarthy on Trademarks § 30:47 (4th ed. 2012) ("[O]nce a probability of proving likelihood of confusion . . . is shown, the trademark owner's business goodwill and reputation are at risk. . . . Like trying to un-ring a bell, trying to use dollars to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute fair or full compensation.").

The sale of counterfeit 5-hour ENERGY® is causing great harm to Living Essentials' valuable goodwill and its continued sale would create a substantial likelihood of irreparable harm to

Plaintiffs. Not only is Living Essentials unable to control the quality of the counterfeit product, the counterfeit product has in fact proven to be vastly inferior to genuine 5-hour ENERGY® products. As noted, consumers have complained to Living Essentials about the taste and performance of product that Living Essentials discovered is counterfeit, demonstrating that the counterfeits have already negatively affected Plaintiffs' reputation. (Dolmage Decl. ¶ 7). In addition, the counterfeit product contains no Vitamin B-12, whereas genuine 5-hour ENERGY® has 8333% of the daily value of B-12, which is directly contrary to the labeling and Living Essentials' extensive efforts to market the fact that 5-hour ENERGY® is "packed with B-vitamins." (Speckin Decl. ¶¶ 20-22). Immediate injunctive relief is, therefore, necessary to prevent further damage to Plaintiffs' reputation and goodwill, which cannot be undone.

**C. <u>The Balance of Equities Tips Decisively in Living Essentials' Favor</u>**

Equitable factors emphatically support the issuance of a temporary restraining order. Because there is no excuse for selling counterfeit goods, the harm to plaintiffs should the requested injunction be denied far outweighs the harm to defendants if their conduct is preliminarily enjoined. Each and every sale of counterfeit 5-hour ENERGY® diminishes the value of Plaintiffs' trademarks, causes harm to Plaintiffs' reputation, and poses a potential public health risk. *See Sanrio Co. v. JIK Accessories*, No. C-09-0440 EMC, 2012 U.S. Dist. LEXIS 55280, at *14 (N. D. Cal. Apr. 19, 2012). By contrast, the requested injunction will not prevent defendants from otherwise continuing to operate their business, of which these transactions presumably constitute only a small part. *See Cytosport*, 617 F. Supp. 2d at 1081 ("[T]he requested injunction does not preclude [defendant] from engaging in its normal business activities, including manufacturing, promoting and selling competing [product]."); *Ventura Travelware, Inc. v. A to Z Luggage Co.*, No. 86 CV 13, 1986 U.S. Dist. LEXIS 18022, at *4 (E.D.N.Y. Nov. 6, 1986) ("[t]he potential injury to plaintiff's sales and good will outweighs any prejudice defendants might suffer by losing business that was obtained by

deliberately copying plaintiff's products"). Defendants have no right to sell counterfeit 5-hour ENERGY® and thus cannot claim hardship based on the proposed injunctive relief.

In addition, defendants' distribution and sale of counterfeit goods causes harm not only to Plaintiffs but also to consumers, who are misled into buying what they mistakenly believe are genuine bottles of 5-hour ENERGY. Plaintiffs cannot vouch for the safety or efficacy of the counterfeit product, since they do not know the conditions under which it is produced and distributed, or whether the counterfeiters have followed Plaintiffs' rigorous quality control guidelines. (*See* Dolmage Decl. ¶ 2). Quite apart from the harm to Plaintiffs' hard-earned reputation and goodwill, this potential threat to public health further justifies immediate injunctive relief. *See, e.g.*, *Burger King Corp. v. Stephens*, No. Civ. A. 89-7691, 1989 U.S. Dist. LEXIS 14527, at *33 (E.D. Pa. Dec. 6, 1989).

**D. <u>An Injunction is in the Public Interest</u>**

"When a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation." *Cytosport*, 617 F. Supp. 2d at 1081; *see also Maxim Integrated Prods.*, 654 F. Supp. 2d at 1036. As noted above, an injunction promotes the public interest by minimizing the risk of consumer confusion and stemming the flow of potentially harmful counterfeit product to consumers. Furthermore, an injunction helps preserve Plaintiffs' hard-earned business reputation and goodwill. It is quite contrary to the public interest to allow defendants, who have been caught red-handed selling counterfeit product, to continue such sales.

**E. <u>At a Minimum, There are Serious Questions Going to the Merits and the Balance of Hardships Decidedly Favors Plaintiffs</u>**

Even if the Court is unable to determine at this juncture that plaintiffs are *likely* to prevail on the merits of their claims, a temporary restraining order is still appropriate. The Ninth Circuit Court of Appeals applies a "sliding scale" approach to preliminary injunctions, such that a

stronger showing of one element may offset a weaker showing of another. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Pursuant to the sliding scale approach, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction" so long as the likelihood of irreparable harm and the public interest prongs are satisfied. *Id.* Unquestionably, Plaintiffs have satisfied that standard. As noted above, there is clear evidence that Defendants sold counterfeit 5-hour ENERGY® featuring counterfeits of Plaintiffs' valid, protectable trademarks. Since trademark infringement is a strict liability offense, to say that this evidence creates serious questions going to the merits of Plaintiffs' case is a significant understatement. Furthermore, as described above, the balance of hardships in this case does not merely tip in Plaintiffs' favor; it is overwhelmingly in Plaintiffs' favor. The loss to Plaintiffs' business reputation and goodwill, along with the threat of consumer confusion and possible health consequences, vastly exceeds whatever minimal hardship defendants face in being restrained from selling products bearing Plaintiffs' marks.

Based on the above considerations, Judge Matsumoto of the United States District Court for the Eastern District of New York granted an *ex parte* temporary restraining order against a different group of wholesalers that had trafficked in counterfeit 5-hour ENERGY® products. *See* Ex. A. This Court should grant the order for the same reasons.

**II.**

**PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* ORDER FREEZING THE DEFENDANTS' ASSETS**

Where, as here, a plaintiff seeks lost profits or other equitable remedies under the Lanham Act, 15 U.S.C. § 1117, a federal court has the "the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." *Republic of the Phillipines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (en banc); *see also Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992)

("Because the Lanham Act authorizes the district court to grant [plaintiff] an accounting of [defendant's] profits as a form of final equitable relief, the district court had the inherent power to freeze [defendant's] assets in order to ensure the availability of that final relief."); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 986-87 (11th Cir. 1995) (affirming asset freeze in counterfeiting case seeking lost profits). The purpose of such an order is "to preserve the possibility of an effective accounting of [the counterfeiter's] profits and the return of the profits fraudulently obtained." *Reebok*, 970 F.2d at 560. Courts recognize that counterfeiters make their living by secrets and subterfuge, and therefore are likely to "hide their allegedly ill-gotten funds" if their assets are not frozen. *Id.* at 563; *accord Lorillard Tobacco Co. v. Montrose Wholesale Candies*, No. 03 C 4844, 2005 U.S. Dist. LEXIS 28917, at *57 (N.D. Ill. Nov. 8, 2005).

Here, the defendants are wholesalers that have conspired to sell and widely distribute counterfeit 5-hour ENERGY® products that fraudulently bear Plaintiff's trademarks, depriving Plaintiffs of their rightful profits and immeasurable goodwill. Defendants' conduct has also caused Plaintiffs to incur enormous expenses in litigation and investigations worldwide, all of which are recoverable under the Lanham Act. *See* 15 U.S.C. § 1117. Accordingly, to ensure that the accounting and lost profits sought by Plaintiffs are available at the conclusion of this action, and to limit the risk to consumers, the Court should freeze the defendants' assets, wherever they may be, and issue such subsequent and additional injunctive orders against non-parties to this action as may be necessary to enable plaintiff fully to enforce this asset freeze order.

The Court's authority to freeze assets is not limited to assets within this District, nor even to assets within the United States. "'Once personal jurisdiction of a party is obtained, the District Court has authority to order it to freeze property under its control, whether the property be within or without the United States.'" *S.E.C. v. International Swiss Investments Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *see also, e.g., Tiffany (NJ) LLC v. Forbse*, No. 11 Civ. 4976 (NRB), 2012 U.S. Dist. LEXIS 72148, at *31-38 (S.D.N.Y. May 23, 2012) ("Given that the Court has

personal jurisdiction over both defendants and the Banks, the Court's authority to restrain defendants' assets that are controlled by the Banks extends to wherever those assets may be located." (internal citations omitted)). Similarly, this Court is armed with further authority under the All Writs Act, 28 U.S.C. § 1651, to issue such orders requiring the cooperation of banks and other non-parties that may have physical custody of defendants' assets. *See United States v. Int'l Bhd. of Teamsters*, 266 F.3d 45, 50 (2d Cir. 2001) (noting that the All Writs Act "encompasses orders imposed against third parties to the extent such parties are poised to interfere with the implementation of a prior judicial order"). Accordingly, Plaintiffs seek to freeze all assets of defendants, wherever and in whomever's possession they may be found.

As well as granting a TRO against 5-hour ENERGY® products in the Eastern District of New York, Judge Matsumoto also granted an order freezing the assets of the corporate defendants in that action that were involved in the wholesale distribution, as opposed to the retail sale, of counterfeits. *See* Exhibit A at 6-7. In this action, *all* of the corporate defendants are wholesalers. *See* Cplt. ¶¶ 59-78. As a result, this Court should grant an order freezing the assets of the corporate defendants for the same reasons the order was granted by Judge Matsumoto.

## III.

## PLAINTIFFS ARE ENTITLED TO AN *EX PARTE* SEIZURE ORDER OF ALL COUNTERFEIT 5-HOUR ENERGY PRODUCTS AND ALL RECORDS DOCUMENTING THE MANUFACTURE, SALE OR RECEIPT OF THOSE COUNTERFEIT GOODS

In addition, Plaintiffs seek *ex parte* seize orders pursuant to the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d)(1). Passed in response to "an 'epidemic' of commercial counterfeiting," *see* S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in 1984 U.S.C.C.A.N. 3627, 3631 (*citing Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984)), the Counterfeiting Act permits a court to grant an *ex parte* order of seizure in "[c]ivil actions arising out of [the] use of counterfeit marks," including

"records documenting the manufacture, sale or receipt" of the counterfeit goods. 15 U.S.C. § 1116(d)(1)(A). As Congress explained in the Senate Report accompanying this bill, "[t]he reason for this provision is that many counterfeiters, once given notice that their fraudulent operations have been discovered, will immediately dispose of the counterfeit goods and make it impossible for the trademark owner ever to bring them to justice." 1984 U.S.C.C.A.N. at 3629. Pursuant to the statute, federal courts regularly grant *ex parte* seizure orders to victims of counterfeiting. *See Reebok Int'l, Ltd. v. Marnatech Enters.,* 970 F.2d 552, 558 (9th Cir. 1992) (noting that lower court properly granted *ex parte* seizure order under section 1116, which "explicitly authoriz[es] the prejudgment seizure of counterfeit goods" and related documentary evidence); *see also* Exhibit D (example seizure orders).

In the Eastern District of New York, Plaintiffs obtained *ex parte* seizure orders against all of the corporate defendants that were involved in the wholesale distribution of counterfeit 5-hour ENERGY® products, with the exception of one publicly traded company for which Plaintiffs considered an *ex parte* seizure impractical and did not seek one. *See* Ex. B. Here, as noted, all of the corporate defendants of which Plantiffs seek *ex parte* seizures are wholesalers. As Judge Matsumoto concluded, Plaintiffs have satisfied all of the statutory prerequisites for obtaining *ex parte* seizure orders under the Counterfeiting Act for these defendants and the orders should be granted. *See* 15 U.S.C. § 1116(d)(4)(B).

**A. <u>An order other than an *ex parte* seizure order is not adequate to achieve the purposes of the Lanham Act (15 U.S.C. § 1116(d)(4)(B)(i)).</u>**

As recognized by Congress in enacting the Counterfeiting Act, counterfeiters are more likely than not to dispose of or conceal the counterfeit goods when confronted with a trademark action. 130 Cong. Rec. H 12076, 12080 ("[M]any of those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon."). Here, Plaintiffs are not seeking *ex parte* seizure orders of the many retailers that sell

counterfeit 5-Hour ENERGY® products and could plausibly have purchased them believing they were authorized products. *See, e.g.*, Tinsley Declaration (identifying some of these retailers). Plaintiffs are only pursuing the wholesalers that have been discovered distributing large quantities of criminally manufactured counterfeits throughout California and other parts of the United States, and who, by the nature of their business, must know, at a minimum, that these products did not come through authorized channels. Without *ex parte* seizures, the chances that Living Essentials will be able to trace this widespread counterfeit conspiracy to its source are vanishingly small. As such, the purposes of the Lanham Act cannot be accomplished without such an order.

**B. <u>Plaintiffs have not publicized the requested seizure (15 U.S.C. § 1116(d)(4)(B)(ii)).</u>**

Plaintiffs have not publicized the requested seizure. (Potter Decl. ¶ 6). On the contrary, as set forth in the accompanying proposed order to show cause, all papers in support of Plaintiffs' application for *ex parte* relief are to be kept under seal by the Clerk of this Court pending the effectuation of the seizure order.

**C. <u>Plaintiffs are likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services (15 U.S.C. § 1116(d)(4)(B)(iii)).</u>**

As demonstrated above, Plaintiffs have submitted evidence that the defendants named in this action are distributing, selling and offering for sale counterfeit 5-hour ENERGY®. Given this indisputable evidence, Plaintiffs have met their burden of demonstrating the likelihood of success on the merits of their counterfeiting claim and need not advance any additional proof to satisfy this statutory criterion. *See* § I(A) above (establishing likelihood of confusion).

**D. <u>An immediate and irreparable injury will occur if such seizure is not ordered (15 U.S.C. § 1116(d)(4)(B)(iv)).</u>**

As discussed above, Plaintiffs can demonstrate irreparable harm as counterfeits are currently being distributed and sold at retail across the country. *See* § I(B) above. Seizing the

product and the paper trail currently in defendants' possession is a necessary first step, both to prevent these defendants from continuing to sell counterfeit and to identify others who may be involved. Until that happens, plaintiffs and the public are being, and will continue to be, irreparably harmed.

**E. The matter to be seized will be located at the place identified in the application (15 U.S.C. § 1116(d)(4)(B)(v)).**

The addresses set forth in the accompanying proposed seizure order were identified by investigators working at the direction of Plaintiffs' attorneys in the United States as addresses currently used by the defendants. *See* Declarations cited in footnote 1.

**F. The harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application (15 U.S.C. § 1116(d)(4)(B)(vi)).**

Defendants have no legitimate interest in selling, offering for sale, or otherwise distributing counterfeit 5-hour ENERGY®, and therefore cannot suffer any harm from the seizure of such goods. Plaintiffs, on the other hand, have a very strong interest in protecting the public's health and safety and their marks from the counterfeits that defendants are selling.

**G. Defendants would be likely to destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person (15 U.S.C. § 1116(d)(4)(B)(vii)).**

By selling counterfeit 5-hour ENERGY® products, the defendants may have knowingly and intentionally engaged in a criminal act. *See* 18 U.S.C. § 2320. At a minimum, they are subject to extensive civil liability for their actions. As a result, there is a real risk that defendants will destroy records and inventory to cover up their unlawful conduct. Unlike small retailers, wholesalers such as defendants have direct access to information about the origin of their products. By the nature of their business, defendants must know, at a minimum, that the counterfeit

products they distribute did not come through authorized channels.[2] More likely, they either acquired the products under suspicious circumstances or knowingly participated in a criminal conspiracy to distribute counterfeit products. If given prior notice that Living Essentials has uncovered their sale of counterfeits, defendants would have every tendency and incentive to destroy or conceal the facts.

The behavior of several defendants in response to Living Essentials' investigative efforts confirms that they would be likely to act deceptively in the absence of an *ex parte* seizure. For example, an employee of defendant Santa Monica Distributing, Incorporated told a Living Essentials investigator to whom he had just sold counterfeit 5-hour ENERGY® products that he had obtained the products directly from the manufacturer. Lichtman Decl. ¶ 12. This was, of course, untrue. A managerial employee for defendant Dan-Dee Wholesale, upon noticing that investigators were attempting to purchase a large amount of 5-hour ENERGY® products, prevented a salesperson from selling them the products on the ground that their reseller license was a duplicate. This was "[d]espite the fact that this reseller's license has consistently been accepted by other wholesalers, and despite the fact that Dan-Dee Wholesale had accepted this reseller's license when we first entered the store." Lichtman Decl. ¶ 22. "Nearby store employees seemed confused and surprised by the owner's behavior, presumably because he was refusing to make a large sale to a customer with appropriate documentation." *Id.* A wholesaler that would refuse to sell counterfeit product out of apparent suspicion of an unknown customer would be likely to take measures to conceal its counterfeiting activities upon being served with a civil complaint.

---

[2] This distinguishes this case from *Wangson Biotech. Grp. v. Tan Tan Trading Co.*, No. C 08-04212 SBA, 2008 U.S. Dist. LEXIS 79691, at *12 (N.D. Cal. Sept. 11, 2008), where Judge Armstrong denied *ex parte* seizure orders to *retailers* who had carried counterfeit products, on the ground "it is equally plausible that defendants may be unwitting purchasers from deceptive sellers, rather than intentional resellers of counterfeit products." Here, in contrast, defendants are wholesalers, who typically have access to authorized channels of distribution and can be charged with knowledge of the provenance of the products they sell.

As Congress noted, "many of those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon." 130 Cong. Rec. H12076, at 12080. It is for this reason (among others) that Congress created heightened tools and remedies to combat counterfeiting, including the remedy of an *ex parte* seizure. Defendants, who are known to have trafficked in counterfeits on a large scale, are precisely the sorts of defendants that Congress had in mind when it authorized *ex parte* seizure orders in the Counterfeiting Act.

**IV.**

**PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY**

Federal courts have broad discretion to expedite the normal pace of discovery in cases seeking temporary or preliminary injunctive relief. 28 U.S.C. § 1657 directs that "the court shall expedite the consideration of . . . any action for temporary or preliminary injunctive relief." Rule 26(d) of the Federal Rules of Civil Procedure allows for expedited discovery and an Advisory Committee comment to that rule notes that expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction." Fed. R. Civ. P. 26(d) and Advisory Comm. Note. Rule 30(a)(2)(A)(iii) provides that the Court may grant leave to take depositions "before the time specified" in the discovery rules. Similarly, Rule 34(b)(2)(A) provides that "[a] shorter or longer time may be . . . ordered by the court" for the production of documents than the rules would otherwise allow. Congress recognized that there is a special need for expedited discovery in counterfeiting cases, specifying in the Trademark Counterfeiting Act that a court may modify the time limits for discovery "to prevent the frustration of the purposes of [a seizure order] hearing." 15 U.S.C. § 1116(d)(10)(B).

In the Ninth Circuit, courts apply a "good cause" standard to evaluate requests for expedited discovery. *UMG Recordings, Inc. v. Doe*, no. C 08-1193 SBA, 2008 U.S. Dist. LEXIS

79087, at *4 (N.D. Cal. Sept. 3, 2008); *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party. *Id.* "[C]ourts have recognized that good cause is frequently found in cases involving claims of infringement and unfair competition." *Id.*; *see also Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674 CIV-JORDAN, 2007 U.S. Dist. LEXIS 98651, at *18 (S.D. Fla. Nov. 21, 2007) ("Courts have recognized that accelerated discovery may be particularly appropriate in cases of trademark counterfeiting."). Provided it is properly tailored to the relief sought, expedited discovery "is routinely granted in actions involving infringement and unfair competition." *Benham Jewelry Corp. v. Aron Basha Corp.*, No. 97 Civ. 3841, 1997 U.S. Dist. LEXIS 15957, at *58 (S.D.N.Y. Oct. 14, 1997); *see, e.g.*, *Chanel, Inc. v. Unincorporated Ass'n*, No. 2:11-cv-03780-GAF-PJW, 2011 U.S. Dist. LEXIS 91376, at *5 (C.D. Cal. Aug. 15, 2011); *Pepsico, Inc. v. Plank*, No. CV 02-02476 NM (RZx), 2002 U.S. Dist. LEXIS 14378 (C.D. Cal. Jul. 18, 2002); *Sony Computer Entm't Am., Inc. v. GameMasters*, 87 F. Supp. 2d 976, 978 (N.D. Cal. 1999); *Hunting World, Inc. v. Reboans, Inc.*, Civ. A. No. C 92 1519 BAC, 1992 U.S. Dist. LEXIS 21477, at *11-12 (N.D. Cal. Apr. 21, 1992).

Here, Plaintiffs' need for prompt discovery is considerable. To date, the counterfeit product has been discovered in no fewer than eight states and appears to be in nationwide distribution. Plaintiffs still do not know where the product comes from. Paintiffs require prompt discovery to find counterfeit products stashed in other locations before defendants can sell and ship them. *See Pod-Ners, LLC v. Northern Feed & Bean*, 204 F.R.D. 675, 676 (D. Colo. 2002) (granting expedited discovery because the products at issue "are commodities and subject to sale, resale, and consumption or use with the passage of time" so prompt inspection of the product and documentation concerning their sale was necessary so that the product "may be traced and inspected wherever they now may be found"). In addition, expedited discovery will allow Plaintiffs to prepare

for, and the Court to conduct, a prompt preliminary injunction hearing. *See* Fed. R. Civ. P. 26(d) and Advisory Comm. Note; *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996) ("[E]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings."). It will also enable Plaintiffs to identify other persons and entities who may be involved in this counterfeiting scheme, which provides added justification for granting the requested order. *See e.g., Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990) (allowing discovery to proceed "on an expedited basis may very well lead to evidence of continuing infringement by [these] defendant[s] or others; it may also lead to the discovery of future plans to infringe or the discovery of additional infringing merchandise.")

Plaintiffs' need for expedited discovery far outweighs whatever prejudice Defendants could claim should this request be granted. The scope of discovery is narrow. *See Federal Express Corp. v. Federal Espresso, Inc.*, No. 97 CV 1219, 1997 U.S. Dist. LEXIS 19144, at *2 (N.D.N.Y. Nov. 24, 1997) ("the scope of permissible expedited discovery is limited to requests that are more narrowly 'tailored to the time constraints under which both parties must proceed [and] to the specific issues that will have to be determined at the preliminary injunction hearing.'"). Plaintiffs seek an order calling for document production and responses to interrogatories within three days of service of the request and depositions on three days' notice. These documents should be at defendants' disposal and defendants will suffer little if any "prejudice" from having to produce them sooner rather than later. Conversely, without expedition, Plaintiffs and the public will continue to be harmed by each and every additional sale of counterfeit product and the Plaintiffs may – as Congress contemplated – find themselves without any evidence to prove their case.

**CONCLUSION**

For the above-stated reasons, the Court should grant Plaintiffs' Order To Show Cause for a temporary restraining order, an *ex parte* seizure order, expedited discovery, and a preliminary injunction, and should award any other and further relief that the Court may deem just and proper.

Dated: San Francisco, CA
October 25, 2012

Respectfully submitted,

Murphy, Pearson, Bradley & Feeney

By: ______________________
Thomas Mazzucco
Aaron McClellan
Bryan Saalfeld

88 Kearny Street
10th Floor
San Francisco, CA 94108
(415) 788-1900

Of Counsel:

Geoffrey Potter
gpotter@pbwt.com
Christos G. Yatrakis
cyatrakis@pbwt.com
Jonah M. Knobler
jknobler@pbwt.com
Alexander Michaels
amichaels@pbwt.com
Jeremy A. Weinberg
jweinberg@pbwt.com
Jane Metcalf
jmetcalf@pbwt.com

1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiffs Innovation Ventures LLC and Living Essentials LLC*