ORIGINAL

1  JENNIFER LEE TAYLOR (CA SBN 161368)
   jtaylor@mofo.com
2  WENDY M. GARBERS (CA SBN 213208)
   wgarbers@mofo.com
3  MARK W. POE (CA SBN 223714)
   mpoe@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California 94105-2482
   Telephone: (415) 268-7000
6  Facsimile: (415) 268-7522

7

8  Attorneys for Defendants
   PITTSBURG WHOLESALE GROCERS, INC.,
   DBA PITCO FOODS; PACIFIC
9  GROSERVICE, INC. DBA PITCO FOODS

10            UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  INNOVATION VENTURES, LLC and LIVING          Case No. 12-cv-5523-WHA
    ESSENTIALS, LLC,
15                                               **PITTSBURG WHOLESALE
         Plaintiffs,                             GROCERS, INC. AND PACIFIC
16                                               GROSERVICE, INC.'S RESPONSE
         v.                                      TO ORDER TO SHOW CAUSE,
17                                               OPPOSITION TO PLAINTIFFS'
    PITTSBURG WHOLESALE GROCERS, INC.,           REQUEST FOR PRELIMINARY
18  D/B/A PITCO FOODS; PACIFIC                   INJUNCTION, AND REQUEST TO
    GROSERVICE, INC. D/B/A PITCO FOODS;          MODIFY EXPEDITED DISCOVERY
19  ARISTOTLE PERICLES NAVAB; DAVID              ORDER**
    LUTTWAY; SANTA MONICA
20  DISTRIBUTING, INC.; MANOUCHEHR               Date:    November 7, 2012
    HEIKALI, A.K.A. DAVID HEIKALI; AZIZ          Time:    3:00 p.m.
21  HEIKALI, A.K.A. ED HEIKALI; ELITE            Place:   Courtroom 8, 19th Floor
    WHOLESALE, INC.; TONIC WHOLESALE,            Judge:   Hon. William H. Alsup
22  INC., D/B/A ACE WHOLESALE; KOAMEX
    GENERAL WHOLESALE, INC.; YOUNG H.
23  KIM, A.K.A. YONG HWAM KIM; DAPAN             **FILED UNDER SEAL**
    USA CORP. D/B/A FRONTIER WHOLESALE;
24  SUNG KEUN LEE; DAN-DEE COMPANY,
    INC.; FADI ATTIQ; KEVIN ATTIQ; and JOHN
25  DOES 1-10,

26       Defendants.

27

28
    PITCO'S OPP'N TO MOT. FOR PRELIM. INJ.
    Case No. 12-cv-5523-WHA
    sf-3214310

1

**TABLE OF CONTENTS**

2                                                                                                                    **Page**

3  TABLE OF AUTHORITIES ............................................................................................................. ii

4  INTRODUCTION ............................................................................................................................. 1

   STATEMENT OF FACTS ............................................................................................................... 2

5        A.      Pitco's Business ......................................................................................................... 2

6        B.      Pitco's Purchase of 5-Hour Energy From Dan-Dee............................................... 3

7        C.      The October 29 Seizure at Pitco's Facilities.......................................................... 5

         D.      Current Status of Counterfeit 5-Hour Energy ........................................................ 6

8        E.      Living Essentials' Violations of the Expedited Discovery Order........................... 7

9  LEGAL STANDARD....................................................................................................................... 8

10 ARGUMENT ................................................................................................................................... 8

11 I.      LIVING ESSENTIALS ARE NOT ENTITLED TO A PRELIMINARY
           INJUNCTION AGAINST PITCO........................................................................................ 8

12       A.      Living Essentials Cannot Demonstrate That They Are Likely to
                 Suffer Irreparable Harm Without an Injunction...................................................... 9

13       B.      The Balance of Equities Does Not Tip in Living Essentials' Favor...................... 10

14       C.      The Public Interest Does Not Require a Preliminary Injunction. .......................... 11

15       D.      The Balance of Hardships Does Not Favor Issuance of a
                 Preliminary Injunction. .......................................................................................... 11

16 II.     IF THE COURT ISSUES A PRELIMINARY INJUNCTION, IT
           SHOULD BE SUBSTANTIALLY NARROWED FROM WHAT
17         PLAINTIFFS PROPOSE........................................................................................................ 12

18 III.    THE COURT SHOULD MODIFY THE EXPEDITED DISCOVERY
           ORDER ................................................................................................................................ 15

19 CONCLUSION............................................................................................................................... 15

20

21

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**CASES**

4

*Affinity Group, Inc. v. Balser Weather Management, LLC*,
5   No. 05-cv-1555, 2007 WL 1111239 (S.D. Cal., April 10, 2007) ......................................... 12

6   *BoomerangIt, Inc. v. ID Armor, Inc.*,
    No. 5:12-cv-0920, 2012 U.S. Dist. LEXIS 86382 (N.D. Cal. June 21, 2012) ........................ 10

7
    *Caribbean Marine Servs. Co. v. Baldridge*,
8   844 F.2d 668 (9th Cir. 1988)....................................................................................... 9

9   *Edge Games, Inc. v. Elec. Arts, Inc.*,
10   745 F. Supp. 2d 1101 (N.D. Cal. 2010) ........................................................................ 8

11  *Gucci America, Inc. v. Daffy's Inc.*,
    354 F.3d 228 (3d Cir. 2003).......................................................................................... 12

12
    *Lorillard Tobacco Co. v. Engida*,
13   213 Fed. Appx. 654 (10th Cir. 2007)...................................................................... 9, 10, 12

14  *Omega World Travel, Inc. v. Trans World Airlines*,
15   111 F.3d 14 (4th Cir. 1997)........................................................................................ 13

16  *Schwartz v. United States Dep't of Justice*,
    Civ. No. 06-5581 (JBS), 2007 U.S. Dist. LEXIS 74608 (D.N.J. Oct. 4, 2007)....................... 13

17  *Signeo USA, LLC v. SOL Republic, Inc.*,
18   No. 5:11-cv-06370, 2012 U.S. Dist. LEXIS 79356 (N.D. Cal. June 6, 2012)........................ 8

19  *Stormans, Inc. v. Selecky*,
20   586 F.3d 1109 (9th Cir. 2009).............................................................................. 9, 10, 11

21  *Winter v. Natural Res. Defense Council*,
    555 U.S. 7 (2008).............................................................................................. 8, 10, 11

22

**OTHER AUTHORITIES**

23

Local Rule 30-1 ......................................................................................................... 7

24

25

26

27

28

**INTRODUCTION**

Until Monday, October 29, Defendants Pittsburg Wholesale Grocers, Inc. and Pacific Groservice, Inc. (collectively doing business as "Pitco Foods," and hereafter referred to as "Pitco"), had no idea that they were in possession of counterfeit 5-Hour Energy products. On that morning, a seizure was effected at Pitco's four Bay Area locations by agents of Plaintiffs Innovation Ventures, LLC and Living Essentials, LLC (together, "Living Essentials").

Pitco did not have any reason to be suspicious of the 5-Hour Energy products it stocked on its shelves. As Living Essentials explain, the differences between the authentic and counterfeit products are subtle and "[o]nly with a close and meticulous inspection can the counterfeit packaging by distinguished from the authentic." (Mem. in Supp. of Pls.' Order to Show Cause ("Mem.") at 2.) As the declarations of Pitco's employees submitted herewith demonstrate (and as Living Essentials' counsel will likely concede at the hearing on this matter), all of Pitco's employees were surprised by the revelations during the seizure. The declarations further show that, despite Living Essentials' overreaching the authority granted by the Court's seizure order, Pitco and every one of its employees cooperated fully in helping Living Essentials' agents take possession of the counterfeit product. Pitco and its employees also provided Living Essentials' agents with a full explanation of where they had purchased the counterfeit product, and provided Plaintiffs with all of the associated documentation.

All of the counterfeit 5-Hour Energy product has now been removed from Pitco's warehouses, and Pitco has no further orders of 5-Hour Energy in place from the only company— Dan-Dee Company, Inc.—from which it had obtained the counterfeit product.

The allegations about Pitco's "active and conscious" participation in a counterfeiting "conspiracy" (Compl. ¶¶ 63, 80, 86, 92, 100, 106), were unfounded from their inception as demonstrated in the documents that Living Essentials seized, and in the depositions taken this week. Like Living Essentials, Pitco is also the victim of counterfeiting because it will never recover what it unwittingly paid for the counterfeit product. Pitco, however, is simultaneously also the victim of Living Essentials' overreaching under the Seizure Order and repeated violations of the Expedited Discovery Order. Pitco was hopeful that Living Essentials would withdraw their

1  request for a preliminary injunction once Living Essentials had the opportunity to confirm the

2  basic facts; instead, the opposite has happened. Living Essentials have insisted that Pitco go

3  forward with expedited depositions if Pitco would not agree to a stipulated preliminary injunction

4  that contains terms above and beyond the proposed preliminary injunction order submitted to the

5  Court.

6  There is no possibility that Living Essentials will suffer future harm connected to Pitco

7  because: (1) all of the counterfeit product has been recovered from Pitco's stores; (2) there are no

8  pending orders of 5-Hour Energy from the only company known to have supplied Pitco with

9  counterfeit product; and (3) Living Essentials have effected a similar seizure of that supplier

10  (defendant Dan-Dee). Accordingly, the issuance of a preliminary injunction, particularly the

11  overly broad injunction sought by Living Essentials, is unwarranted, and would unduly burden

12  Pitco. Living Essentials' request for a preliminary injunction should be denied.

13  For the same reasons, Pitco requests that the Court modify the Expedited Discovery Order

14  for discovery targeted at Pitco, and its officers, owners and employees. As explained further

15  below, Pitco has been fully cooperative with Living Essentials under the Seizure Order; there is

16  no reason for Pitco to be subjected to further expedited discovery, particularly when Living

17  Essentials have repeatedly violated the terms of that Order by seeking discovery on an even more

18  expedited basis, with no prior consultation with the other parties.

19  **STATEMENT OF FACTS**

20  **A.    Pitco's Business**

21  Pitco is a major Bay Area grocery and consumer goods wholesaler with four locations:

22  San Jose, Brisbane, Oakland, and Sacramento. (Declaration of David Luttway in Support of Pitco

23  Foods' Opposition to Plaintiffs' Motion for Preliminary Injunction "Luttway Decl." ¶ 6.) Pitco

24  has been in business for 30 years, employs over 350 people, and currently has annual revenue

25  exceeding half a billion dollars. (*Id.* ¶¶ 9-10, 25.) Pitco has never before been accused of

26  carrying counterfeit goods. (*Id.* ¶ 25.)

27  Pitco's business is to purchase food, beverages, groceries, and consumer products from a

28  variety of vendors, and then to resell those products on a wholesale basis to retail businesses, who

PITCO'S OPP'N TO MOT. FOR PRELIM. INJ.
Case No. 12-cv-5523-WHA                                                                                 2
sf-3214310

1  in turn sell them to individual consumers. (*Id.* ¶ 5.) Pitco serves independent stores in northern

2  California from Napa to the Fresno and Bakersfield area. Its customers are small, independent

3  businesses such as convenience stores, gas stations, Hispanic grocery stores, and bodegas. These

4  stores are often passed over by larger vendors, and struggle to compete with large "big box"

5  retail. (*Id.*) A key feature of Pitco's business is that it does not enter any long-term contracts

6  with any specific vendor; rather, it continuously shops among vendors for the best deal on a given

7  product. (*Id.* ¶¶ 11-15.) Pitco currently does business with hundreds of vendors, and has a

8  customer base of 11,000 retail stores. (*Id.* ¶¶ 5, 11.)

9  Cadigan GroService Holding Company is owned by Pericles Navab and David Luttway.

10  (*Id.* ¶ 3.) Messrs. Navab and Luttway are two named defendants in this matter, but they have not

11  been served. In 2004, Cadigan Growth Services Holding Company bought Pittsburg Wholesale

12  Grocers, Inc. and Pacific Groservice, Inc. Pittsburg Wholesale Grocers is the corporate name of

13  the Brisbane, Sacramento and Oakland locations, and Pacific Groservice is the corporate name of

14  the San Jose location. Together, both companies do business as Pitco Foods. (*Id.*) Mr. Navab

15  and Mr. Luttway both hold MBAs from Harvard University. (*Id.* ¶ 2.)

16  **B. Pitco's Purchase of 5-Hour Energy From Dan-Dee**

17  Pitco has carried 5-Hour Energy for several years, as one of the thousands of products that

18  it carries. (Declaration of Scarlet Disho in Support of Pitco Foods' Oppostion to Plaintiffs'

19  Motion for Preliminary Injunction "Disho Decl." ¶ 3; Luttway Decl. ¶ 3.) Pitco initially obtained

20  most of its 5-Hour Energy inventory from a company called Paramount Sales Group, which it

21  understands to be a contracted distributor for Living Essentials. (Disho Decl. ¶ 3.) In the fall of

22  2011, Pitco was approached by Dan-Dee Company, Inc., a vendor from whom Pitco purchased an

23  array of other products, which was offering to sell Pitco 5-Hour Energy. (*Id.* ¶ 7.) Pitco has done

24  business with Dan-Dee for roughly three years. (*Id.* ¶ 6.) Dan-Dee carries a small and rotating

25  array of products, which is common in the wholesale business. (*Id.*) In the past, Pitco has

26  purchased such varied products as Sobe, Snickers, a type of Mexican snack chip, and toilet paper

27  from Dan-Dee. (*Id.*) A product line that Dan-Dee often carries is energy drinks; Pitco has in the

28  past bought Rockstar and Red Bull from the company. (*Id.*) In total since 2009, Pitco has done

1  roughly $11 million worth of business with Dan-Dee, and has never had any problem with the
2  authenticity of the goods it has acquired from the company. (*Id.*)

3      In response to Dan-Dee's November 2011 offer of 5-Hour Energy, Scarlet Disho, Pitco's
4  "Category Manager" for beverage products, contacted Dan-Dee, and was told that Dan-Dee had
5  become a contracted distributor for 5-Hour Energy. (*Id.* ¶ 7.) Ms. Disho arranged to purchase 5-
6  Hour Energy from Dan-Dee at approximately $275 per case of 216 bottles. (*Id.*) Pitco had
7  previously been paying approximately $300 per case to Living Essentials' broker, Paramount
8  Sales Group. Accordingly, Dan-Dee's price represented about an 8% savings. (*Id.*) In the
9  wholesale industry, where discounts of 30-40% off the manufacturer's price are routinely
10  encountered from third-party vendors, the amount of Dan-Dee's discount did not arouse
11  suspicion. (*Id.* ¶ 10; Luttway Decl. ¶ 23.) In fact, two weeks ago, Paramount Sales Group itself
12  sold Pitco two pallets of 5-Hour Energy for $284 per case. (Disho Decl. ¶ 7.)

13      None of Pitco's employees had any idea that the 5-Hour Energy it had purchased from
14  Dan-Dee was counterfeit. (*Id.* ¶¶ 18-19; Luttway Decl. ¶ 24; Declaration of Ed Lane in Support
15  of Pitco Foods'Opposition to Plaintiffs' Motion for Preliminary Injunction "Lane Decl." ¶ 9;
16  Declaration of Steve Perez in Support of Pitco Foods' Opposition to Plaintiffs' Motion for
17  Preliminary Injunction "Perez Decl." ¶ 8; Declaration of Terry Villegas in Support of Pitco
18  Foods' Opposition to Plaintiffs' Motion for Preliminary Injunction "Villegas Decl." ¶ 8;
19  Declaration of Mark Kono in Support of Pitco Foods' Opposition to Plaintiffs' Motion for
20  Preliminary Injunction "Kono Decl." ¶ 17.) Nor does Pitco know whether all of the 5-Hour
21  Energy it purchased from Dan-Dee was counterfeit, or only some portion of it. (Disho Decl. ¶
22  18.) As Living Essentials have alleged, the differences are exceptionally subtle: "[o]nly with a
23  close and meticulous inspection can the counterfeit packaging be distinguished from the
24  authentic." (Mem. at 2.) Notably, even if Pitco had known how to distinguish the counterfeit
25  product alleged in this action from the authentic product, none of the telltale features (a slightly
26  shorter bottle, a typo in one word on the individual bottles' label, the absence of a "pimple" mark
27  on the cap, a "slightly fatter silhouette of a man running," and a product that does not taste and
28  smell the same as the genuine product (Compl. ¶ 48)) could be identified when the product is still

PITCO'S OPP'N TO MOT. FOR PRELIM. INJ.
Case No. 12-cv-5523-WHA                                                                4
sf-3214310

1   in the cases, which are the units by which Pitco sells the product wholesale. The only feature that

2   is conceivably apparent from the outside of the case is that chemically different inks are

3   supposedly used to print the cases containing the counterfeit product, but Plaintiffs concede that it

4   requires a "forensic analysis" to detect that difference. (*Id.*)

**C.    The October 29 Seizure at Pitco's Facilities**

6   At approximately 9:00 a.m. on Monday, October 29, 2012, agents of Living Essentials

7   simultaneously appeared at Pitco's four Bay Area locations to effect the seizure authorized by the

8   Court's October 25 order. (Declaration of Sue Ereso in Support of Pitco Foods' Opposition to

9   Plaintiffs' Motion for Preliminary Injunction "Ereso Decl." ¶ 3; Perez Decl. ¶ 3; Kono Decl. ¶ 3;

10  Lane Decl. ¶ 3.) However, in carrying out that seizure, Living Essentials exceeded the bounds of

11  the Court's Order, with little regard to Pitco's rights. At three of the four Pitco locations, Living

12  Essentials' attorneys and other agents falsely represented that they had the authority to shut down

13  the entire store. (Lane Decl. ¶ 4; Kono Decl. ¶ 4; Ereso Decl. ¶ 4.) Acting under the color of that

14  supposed authority, Living Essentials shut down the Sacramento store for approximately one

15  hour, and the Brisbane store for approximately half an hour, causing a number of customers who

16  were in the stores to leave and causing other customers to turn away at the door. (Lane Decl. ¶ 4;

17  Kono Decl. ¶ 9.) At the San Jose location, the General Manager had the presence of mind to call

18  Living Essentials' attorney's bluff, and refused to close the store. (Villegas Decl. ¶ 4.) The

19  fourth Living Essentials team apparently complied with the law and the Court's Order in this

20  regard, and did not demand to shut down Pitco's entire Oakland facility to effect the seizure of

21  just one product. (Perez Decl. ¶ 5.) That said, the teams at both the Brisbane and Oakland

22  facilities further violated the Court's Order in having Living Essentials' attorneys and private

23  investigators demand that Pitco's employees produce to them their driver's licenses, and

24  recording details from those licenses. (Kono Decl. ¶ 7; Perez Decl. ¶ 5.) Under the Order, only

25  "a law enforcement officer" is permitted to demand production of identification from Pitco's

26  employees. (Seizure Order at 4.)

27  Despite this overreaching by Living Essentials, Pitco and all of its employees fully

28  cooperated with Living Essentials' teams, assisting them in locating, identifying, and seizing the

1  counterfeit products; producing Pitco's documents and computer files relating in any way to its

2  purchases of 5-Hour Energy; and voluntarily answering all of the questions that Living

3  Essentials' attorneys and investigators put to them. (Villegas Decl. ¶ 4; Perez Decl. ¶ 5; Lane

4  Decl. ¶¶ 6-7; Disho Decl. ¶¶ 16-17; Kono Decl. ¶ 7.)

5      Subsequent to the seizure, Pitco located additional documents relevant to its purchases of

6  5-Hour Energy, namely, internal e-mails and wire transfer information, and duly produced them

7  on November 2, as required by the seizure order. (Seizure Order at 5.)

8          **D.     Current Status of Counterfeit 5-Hour Energy**

9      As Living Essentials will acknowledge at the hearing on this matter, all of the counterfeit

10  5-Hour Energy that had been in Pitco's four facilities has been removed. Pitco currently has no

11  5-Hour Energy on order from Dan-Dee, the sole vendor from which it obtained the counterfeit

12  items. (Disho Decl. ¶ 9.) Pitco's most recent order of 5-Hour Energy was on October 18; it was

13  placed with Paramount Sales Group, who has also identified itself as Living Essentials'

14  contracted distributor. (*Id.* ¶ 3.) Nevertheless, because of uncertainty about the terms of the

15  Seizure Order and Pitco's inability to distinguish counterfeit product from genuine product with

16  certainty, that product remains segregated at Pitco's stores.

17      Finally, at the deposition of Dan-Dee's principal Kevin Attiq, which was taken by Living

18  Essentials just yesterday, Mr. Attiq testified that he himself had no idea that the product he had

19  acquired was counterfeit, nor did he have any reason to suspect it might be counterfeit.

20  (Declaration of Wendy Garbers in Support of Pitco Foods' Opposition to Plaintiffs' Motion for

21  Preliminary Injunction "Garber Decl." ¶ 3.) He testified that he had acquired it from a distributor

22  named Midwest Wholesale Distributors, a Michigan company, led by Walid Jamil. (*Id.*) Mr.

23  Attiq also testified that he would never have jeopardized Dan-Dee's relationship with a major

24  customer like Pitco by knowingly selling it a counterfeit product. (*Id.* ¶ 6.) Based upon Living

25  Essentials' questioning of Mr. Attiq, it appears that Living Essentials knew before Mr. Attiq's

26  deposition began that Midwest Wholesale Distributors was the source of the counterfeit products.

27  (*Id.* ¶ 3.)

28

**E.     Living Essentials' Violations of the Expedited Discovery Order**

Subsequent to the October 29 seizure, Living Essentials have consistently violated the already permissive Expedited Discovery Order in seeking discovery from the defendants. Despite knowing that Pitco is represented by counsel in this matter, and without prior consultation as is required by Local Rule 30-1 and this Court's Standing Order, at approximately 5:00 p.m. on October 31, Living Essentials provided Pitco notice that Living Essentials intended to take two depositions of Dan-Dee's principals, Kevin Attiq and Fadi Attiq, *the following morning at 10:00 a.m.* in San Diego. (Declaration of Mark Poe in Support of Pitco Foods' Opposition to Plaintiffs' Motion for Preliminary Injunction "Poe Decl." ¶¶ 3-4, Exs. 2-3.) When Pitco objected to the lack of notice, Living Essentials offered to move the deposition to one of the two following days. (*Id.*) Neither the original notice, nor the offer to delay the deposition by a day or two, complied with the Expedited Discovery Order that requires "*notice in writing to every other party of at least three calendar days*." (Exp. Disc. Order at 2 (emphasis added).)

On November 2, Living Essentials again flouted its obligations to meet and confer in advance and served notice on Pitco that Living Essentials intended to take corporate depositions of Pitco—Pittsburg Wholesale Grocers, Inc. and Pacific Groservice, Inc. on November 6. (Poe Decl. ¶¶ 7-8, Exs. 6-7.) On November 2, Living Essentials sent an additional notice for the November 6 deposition of Pericles Navab, chief executive of the holding company that owns Pittsburg Wholesale Grocers, Inc. and Pacific Groservice, Inc., with no prior consultation with Pitco's counsel. (*Id.* ¶ 9, Ex. 8.) Pitco scrambled over the weekend to locate appropriate corporate witnesses and to negotiate with Living Essentials to re-schedule the corporate depositions for the morning of November 7. (*Id.* ¶ 6, Ex. 5.) Pitco also objected to the deposition of Mr. Navab on apex grounds. (*Id.* ¶ 10, Ex. 9.)

In response to nearly every objection to the untimely deposition notices, Living Essentials have repeated the mantra that the depositions must go forward unless the defendants agree to enter into a stipulated preliminary injunction prepared by Living Essentials. (*Id.* ¶ 11, Ex. 10.) For a party that innocently bought product that it thought was genuine, the stipulation is far too broad in its terms. It also includes a waiver of defenses to the seizure and preliminary injunction

1    and releases Living Essentials from all liability for the seizures executed against the parties.

2    Notably, when Dan-Dee's counsel sent an e-mail requesting modifications to the proposed

3    stipulated preliminary injunction, Living Essentials' counsel made it clear that the stipulated

4    preliminary injunction is a take or leave it offer. (*Id.* ¶¶ 12-13, Exs. 11-12.)

**LEGAL STANDARD**

6           "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear

7    showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Defense Council*, 555

8    U.S. 7, 22 (2008). As this Court recently summarized, "[a] plaintiff seeking a preliminary

9    injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

10   irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

11   and that an injunction is in the public interest." *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp.

12   2d 1101, 1114-15 (N.D. Cal. 2010) (citing *Winter*, 555 U.S. at 19). The party seeking the

13   injunction bears the burden of proving that each of these factors is satisfied. *Signeo USA, LLC v.*

14   *SOL Republic, Inc.*, No. 5:11-cv-06370, 2012 U.S. Dist. LEXIS 79356, at *14-15 (N.D. Cal. June

15   6, 2012).

**ARGUMENT**

17   **I.    LIVING ESSENTIALS ARE NOT ENTITLED TO A PRELIMINARY**
18   **INJUNCTION AGAINST PITCO.**

19           At present, Pitco does not have any reason to doubt Living Essentials' allegation that the

20   5-Hour Energy it purchased from Dan-Dee was counterfeit. But even if Living Essentials are

21   likely to succeed on the merits of their causes of action,[1] Living Essentials fails to satisfy any of

22   the other factors required to warrant issuance of a preliminary injunction.

23

24

25

---

26           [1] As set forth above, Living Essentials will not prevail on those causes of action for which
     culpable state of mind is an element. Indeed, in the entirety of Living Essentials' Complaint,
27   there is not a single fact-based allegation claiming that Pitco had knowledge that the 5-Hour
     Energy product was counterfeit.
28

A.   **Living Essentials Cannot Demonstrate That They Are Likely to Suffer Irreparable Harm Without an Injunction.**

There is no likelihood that Living Essentials will suffer irreparable harm from Pitco's actions because all of the offending product has been removed from Pitco's warehouses, and Pitco has no other 5-Hour Energy product on order from the offending supplier.

As the Ninth Circuit explained in *Caribbean Marine Services Co. v. Baldridge*:

> At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm. Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.

844 F.2d 668, 674 (9th Cir. 1988). Living Essentials cannot satisfy that standard here.

Notably, Plaintiffs' entire irreparable harm argument is premised—as it logically must be—on the prospect of future sales of the counterfeit product. (Mem. at 10-11.) Specifically, they argue only that "*selling* an inferior product destroys good will associated with the plaintiff's mark," and that "*continued sale* [of the counterfeit product] would create a substantial likelihood of irreparable harm to Plaintiffs." (*Id.* (emphasis added).) While that argument may have been sufficient ground to warrant issuance of the Temporary Restraining Order, it has now become perfectly moot, at least with respect to Pitco. There is no prospect of future sales of the offending product by Pitco, because all of the product has been removed from Pitco's warehouses, and because Pitco has no outstanding orders from Dan-Dee, the sole supplier from which it obtained the product. (*See* Disho Decl. ¶ 9.) Even if Living Essentials were able to hypothesize some way by which Pitco might again sell the infringing product, the Ninth Circuit has emphasized that "the correct standard is not whether there is a 'possibility' but whether there is a 'likelihood of irreparable injury.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 26.).

In similar circumstances, the Tenth Circuit affirmed the denial of a preliminary injunction in the decision of *Lorillard Tobacco Co. v. Engida*, 213 Fed. Appx. 654 (10th Cir. 2007). There, a store had been accused of selling counterfeit Newport cigarettes. *Id.* at 654. But when the

1   tobacco company effected the seizure, the store was found not to possess any Newports, authentic

2   or otherwise. *Id.* at 655. The court affirmed the finding that the tobacco company had failed to

3   carry its burden of demonstrating irreparable harm, because it failed to show "a substantial

4   likelihood that [the store] had or would sell any additional counterfeit Newport® cigarettes." *Id.*

5   at 657. Here, although Pitco does not dispute that it may have possessed counterfeit 5-Hour

6   Energy when the seizure was effected, Living Essentials can present no evidence suggesting that

7   future sales are likely. Accordingly, they are not entitled to the extraordinary relief of an

8   injunction, at least not against Pitco.

9        Where the proponent of a preliminary injunction fails to demonstrate the likelihood of

10   irreparable harm, there is no need for the court even to consider the other *Winter* factors.

11   *BoomerangIt, Inc. v. ID Armor, Inc.*, No. 5:12-cv-0920, 2012 U.S. Dist. LEXIS 86382, at \*7

12   (N.D. Cal. June 21, 2012) ("Courts have consistently identified a showing of likely irreparable

13   harm as the single most important prerequisite for the issuance of a preliminary injunction;

14   Plaintiff must make that showing before the other requirements for the issuance of a preliminary

15   injunction need even be considered.") (citation omitted). Nevertheless, in the following sections

16   Pitco explains that Living Essentials also fail to satisfy the other *Winter* factors.

17     **B.**    **The Balance of Equities Does Not Tip in Living Essentials' Favor.**

18        "To qualify for injunctive relief, the plaintiffs must establish that 'the balance of equities

19   tips in [their] favor.'" *Stormans*, 586 F.3d at 1138 (quoting *Winter*, 555 U.S. at 19). As with

20   irreparable harm, the entirety of Living Essentials' analysis of the balance of the equities is

21   predicated on the existence of future sales by Pitco. (Mem. at 11-12.) Accordingly, Plaintiffs

22   argue that "Defendants have no right to sell counterfeit 5-Hour Energy," and that "each and every

23   sale of counterfeit 5-Hour Energy diminishes the value of Plaintiffs' trademarks." (*Id.* at 11-12.)

24   Because the premise of Living Essentials' argument—future sales—is absent at least with respect

25   to Pitco, Living Essentials also fail to carry their burden of proof on this factor.

26        A further equitable consideration stems from the fact that the injunction that Living

27   Essentials seeks—a Court order imposing strict liability and contempt if Pitco sells any bottle of

28   counterfeit product—is extremely difficult to comply with from Pitco's position, since, as Living

1    Essentials explain, the products are very hard to tell apart.  Furthermore, the counterfeiters behind

2    this scheme can easily correct the exterior hallmarks of the counterfeits (the absence of a pimple,

3    and the typo on the label), making it all but impossible for Pitco to know whether a given bottle is

4    authentic.  If the injunction were issued as drafted, Pitco's only practical solution would be to

5    stop selling 5-Hour Energy altogether.  That result would be an undue burden on a blameless

6    company who has assiduously cooperated with Living Essentials and complied with the Court's

7    Orders.

8         **C.    The Public Interest Does Not Require a Preliminary Injunction.**

9         "The plaintiffs bear the initial burden of showing that the injunction is in the public

10   interest," and "the court should weigh the public interest in light of the *likely* consequences" that

11   will flow from issuance or denial of the requested injunction  *Stormans*, 586 F.3d at 1139

12   (emphasis in original).  *Stormans* further explains that the prospect of such consequences "must

13   be supported by evidence."  *Id.*  Living Essentials cannot carry their burden with respect to this

14   factor, because again, their argument regarding the public interest is strictly predicated on the

15   prospect of future sales.  (Mem. at 12 ("It is quite contrary to the public interest to allow

16   defendants . . . to continue such sales.").)  Because there is no evidence from which one could

17   reasonably infer that Pitco will engage in future sales of the counterfeit product, there is no public

18   interest to be served by issuance of an injunction.

19        **D.    The Balance of Hardships Does Not Favor Issuance of a Preliminary
                  Injunction.[2]**

20

21        In contrast to their argument on each of the other *Winter* factors, Plaintiffs' argument on

22   the balance of the hardships does not depend on the risk of future sales.  Instead, the only basis

23   they assert in support of this factor is the "clear evidence that Defendants sold counterfeit 5-Hour

24   Energy."  (Mem. at 13.)  If that were all that were required to demonstrate a favorable balance of

25

26   ───────────────

27        [2] Under the *Winter* standard, "balance of hardships" is subsumed within the "balance of
     equities" factor.  *See Stormans*, 586 F.3d at 1138.  But since Plaintiffs argue it separately in their
28   brief (*see* Mem. at 12-13), Pitco responds separately.

PITCO'S OPP'N TO MOT. FOR PRELIM. INJ.
Case No. 12-cv-5523-WHA                                                                          11
sf-3214310

1    hardship, this factor would collapse into the "likelihood of success on the merits" factor, and
2    become meaningless.

3        Contrary to Plaintiffs' argument, now that Pitco's unwitting sales of counterfeit product
4    have stopped, the balance of hardships flowing from an injunction weighs in *Pitco's* favor and
5    against an injunction. In *Lorillard*, discussed above, the court noted that "the counterfeit
6    packages are so similar to genuine packages that an injunction would probably require [the
7    defendant] to stop selling any Newport® cigarettes while the suit was pending, for fear that it
8    would inadvertently violate the injunction." 213 Fed. Appx. at 657. In light of that risk, and in
9    the absence of any evidence that the defendant was likely to engage in future sales, the court held
10   that "an injunction would weigh much more heavily on [the defendant] than the lack of one
11   would affect Lorillard." *Id.*; *see also Gucci America, Inc. v. Daffy's Inc.*, 354 F.3d 228, 237 (3d
12   Cir. 2003) (affirming the denial of a preliminary injunction in the trademark context because
13   "Daffy's efforts to minimize the damage to Gucci before the bags proved to be counterfeit
14   'undermines any inference that Daffy's intends to infringe Gucci's trademarks in the future.'")
15   (quoting district court). Here too, there is no evidence suggesting that Pitco will make future
16   sales of the infringing product, and thus the risk of inadvertently violating an injunction and being
17   held in contempt outweighs the hardship that Living Essentials will face if no injunction is issued.
18   *See Affinity Group, Inc. v. Balser Weather Management, LLC*, No. 05-cv-1555, 2007 WL
19   1111239, at *4 (S.D. Cal., April 10, 2007) (denying a preliminary injunction in a trademark case
20   where the plaintiff "has not shown any threat of future infringement, absent the instances of past
21   infringement alleged in the Complaint").

22   **II.    IF THE COURT ISSUES A PRELIMINARY INJUNCTION, IT SHOULD BE
23   SUBSTANTIALLY NARROWED FROM WHAT PLAINTIFFS PROPOSE.**

24       The preliminary injunction that Plaintiffs propose is greatly overbroad. (Order to Show
25   Cause at 2-4, ¶¶ 1-10.) It lists ten things that Pitco would be enjoined from doing, most of which
26   have no bearing on the sole action that Pitco is accused of: unwittingly selling a particular form of
27   counterfeit 5-Hour Energy product. (Compl. ¶¶ 59, 61, 62.) It is axiomatic that the scope of a
28   preliminary injunction must bear some relationship to what the defendant is alleged to have done.

*See, e.g., Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action."); *Schwartz v. United States Dep't of Justice*, Civ. No. 06-5581 (JBS), 2007 U.S. Dist. LEXIS 74608, at *8 (D.N.J. Oct. 4, 2007) ("A preliminary injunction grants intermediate relief of the same character as that which may be granted finally. When the movant seeks intermediate relief beyond the claims in the complaint, the court is powerless to enter a preliminary injunction.") (citation and internal quotation marks omitted).

Contrary to that principle, Living Essentials seeks an undifferentiated injunction against all of the defendants, regardless of their role. If Living Essentials' requested injunction were issued, and were it to become public, Pitco's good name and business reputation would be pointlessly sullied by the imprimatur of a court order suggesting that Pitco had been:

- "using" marks "confusingly similar" to Living Essentials';
- "unfairly competing with Living Essentials;"
- "falsely representing" itself "as being connected with Plaintiffs;"
- "using [a] counterfeit . . . in connection with [ ] publicity, promotion, sale, or advertising;"
- "affixing . . . a false description" on products it sells;
- destroying documents and business records relating to this matter; and
- "abetting [some] other person or business entity in engaging in" counterfeiting.

(Order to Show Cause at 3-4.)[3]

Pitco has done none of these things knowingly, never had any intention of doing them, and would never knowingly do them. There is no logical reason that a company with over half a billion dollars in yearly revenue, run by two graduates of Harvard Business School (Luttway

---

[3] The only facts alleged in the Complaint with regard to Pitco are these: agents of Living Essentials purchased 5-Hour Energy products at three Pitco warehouses that turned out to be counterfeit. (Compl. ¶¶ 59, 61, 62.) There are no factual allegations in the Complaint or in Plaintiffs' brief suggesting that Pitco engaged or threatens to engage in any of the other varied conduct that Living Essentials seeks to have enjoined.

1  Decl., ¶¶ 10 and 2), would risk its reputation to save $9 per case of 5-Hour Energy over the price
2  offered by Paramount Sales Group. (Disho Decl., ¶ 7.) Entry of the proposed broad preliminary
3  injunction against Pitco is not a solution to Living Essentials' counterfeiting problem, because it
4  just sets a trap in which Pitco might find itself ensnared—while being held to a standard of strict
5  liability for something that it cannot control.

6        Living Essentials' moving papers show that there is a robust market in counterfeit 5-Hour
7  Energy. Even if Pitco were scrupulously careful to examine bottles in every future shipment of 5-
8  Hour Energy, which would require opening cases that could not be re-sold, to determine whether
9  the bottles had pimples or not, that might not be enough to comply with the preliminary
10  injunction. Now that these seizures have taken place, the counterfeiters will almost certainly
11  modify their techniques to add a pimple to the top of their bottles and to correct their typo,
12  rendering their products visually identical to the genuine products. Pitco would face strict
13  liability and be held in contempt over something that it could not control, except by discontinuing
14  all sales of 5-Hour Energy. Such a solution is untenable, however, as Pitco's retailer customers
15  expect it to carry a wide variety of products to meet all of their needs, which includes 5-Hour
16  Energy. The Court should not issue such a broad order that gives Pitco the Hobbesian choice of
17  discontinuing an important product line for its own customers or risking being held in contempt
18  of court.

19        Just as importantly, issuance of an injunction against future conduct would suggest to the
20  public that Pitco was likely to *continue* trading in counterfeits unless the Court ordered it to stop.
21  As all of the evidence shows—both that presented by Pitco herein, and that which may be offered
22  by Living Essentials at the hearing—nothing could be further from the truth. In this way also,
23  issuance of an injunction against Pitco would weigh far more heavily upon Pitco than the absence
24  of an injunction would weigh upon Living Essentials.

25        If the Court were nevertheless to issue an injunction, Pitco requests that it be narrowly
26  tailored to enjoin Pitco from selling 5-Hour Energy products sourced from Dan-Dee that bear the
27  readily visible characteristics of the counterfeit goods described in the complaint. Pitco wants to
28  be sure that it is in compliance with any injunction, and it is only fair that such an injunction

PITCO'S OPP'N TO MOT. FOR PRELIM. INJ.
Case No. 12-cv-5523-WHA
sf-3214310

14

provide a ready way to distinguish between legitimate and counterfeit products. Accordingly, if the Court is inclined to issue an injunction, Pitco respectfully suggests that it should be worded as follows:

    1. Pitco shall not sell any 5-Hour Energy products sourced from Dan-Dee that have the following readily observable features of the counterfeit goods described in the complaint: (1) the absence of a "pimple mark" on the cap, and/or (2) the misspelled word "art ficial" on the label.

## III.    THE COURT SHOULD MODIFY THE EXPEDITED DISCOVERY ORDER

Given that Living Essentials appear to have found the source of the counterfeit products—Midwest Wholesale Distributors, and given the scope of the documents and products already seized from the parties and Living Essentials' repeated violation of the Expedited Protective Order that is in place, Pitco requests that the Court modify the Expedited Discovery Order to require more than three days' notice of depositions and document requests targeted at Pitco, its officers, owners, and employees. Pitco is an innocent party that is being unfairly burdened by excessive discovery requests from Living Essentials, who already know the scope of the counterfeit products inadvertently bought and sold by Pitco, and the source of that product. After the corporate deposition of Pitco that is scheduled for November 7, there will be no need for additional expedited discovery from Pitco, its officers, owners, and employees.

<b>CONCLUSION</b>

For all of the foregoing reasons, Pitco submits that Plaintiffs request for issuance of a preliminary injunction should be denied, or in the alternative, limited to prohibiting the conduct that Pitco is alleged to have engaged in, and that the Expedited Discovery Order be modified to exclude Pitco from further expedited discovery.

1   Dated: November 6, 2012                    MORRISON & FOERSTER LLP

2

3                                              By:
                                                  Jennifer Lee Taylor
4
                                               Attorneys for Defendants
5                                              PITTSBURG WHOLESALE
                                               GROCERS, INC., DBA PITCO
6                                              FOODS; PACIFIC GROSERVICE,
                                               INC. DBA PITCO FOODS
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28