IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INNOVATION VENTURES, LLC, et al.,

    Plaintiffs,

  v.

PITTSBURG WHOLESALE GROCERS, INC., et al.,

    Defendants.

No. C 12-05523 WHA

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

**INTRODUCTION**

In this anti-counterfeiting action involving 5-hour Energy drinks, certain defendants move to dismiss various claims in the second amended complaint. The main issue concerns the extent to which an exclusive licensee qualifies as a "registrant" under Section 32 of the Lanham Act. For the reasons explained below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

According to the second amended complaint, plaintiff International IP Holdings, LLC is the owner of the 5-hour Energy trademark, copyright, and trade dress. Plaintiff Innovation Ventures, LLC is the worldwide exclusive licensee of the 5-hour Energy trademark, copyright, and trade dress. Plaintiff Living Essentials, LLC is a subsidiary of Innovation Ventures and distributes the 5-hour Energy product.

Plaintiffs allege that the defendants in this action have been involved in a widespread scheme to manufacture and sell counterfeit 5-hour Energy drinks. Defendants Pittsburg Wholesale Grocers, Inc., Pacific Groservice, Inc., (collectively, Pitco) and defendant United Custom Distribution, LLC are among the many wholesale grocery concerns and distributors targeted by plaintiffs.

Pitco now moves to dismiss five of the eleven claims in the second amended complaint: claims I and II (trademark infringement under the Lanham Act) *only* as to plaintiffs Living Essentials and Innovation Ventures; claim III for contributory trademark infringement; claim IX for unfair competition under California law; and claim XI for common-law unjust enrichment. Defendant United Custom has filed a one-page motion for joinder in the motion to dismiss.

Defendants' motion to dismiss the Lanham Act claims challenges the assertion of these claims by both Living Essentials and Innovation Ventures. Plaintiffs consent to the dismissal of claims I and II under the Lanham Act only as asserted by Living Essentials. Those claims are **DISMISSED** insofar as asserted by Living Essentials.

Plaintiffs oppose all other aspects of defendants' motions. This order now turns to an analysis of these remaining issues.

**ANALYSIS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendants are liable for the misconduct alleged. While a court "must take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949–50.

There is a distinction between constitutional standing under Article III and statutory standing to bring suit. The questions of statutory standing in defendants' motion to dismiss are properly analyzed under Rule 12(b)(6). *Cetacean Cmty. v. Bush*, 286 F.3d 1169, 1175 (9th Cir. 2004).

2

### 1. INNOVATION VENTURES HAS STANDING UNDER SECTION 32.

Only a "registrant" may bring a claim under Section 32 of the Lanham Act for an ex parte seizure, a drastic and extraordinary remedy. *See* 15 U.S.C. 1114; 15 U.S.C. 1116(d); *In re Lorillard Tobacco Co.*, 370 F.3d 982, 984, 989, 993 n.3 (9th Cir. 2004). The term "registrant" in the statute "embrace[s] the legal representatives, predecessors, successors and assigns of . . . the registrant." 15 U.S.C. 1127. Pitco argues that Innovation Ventures lacks standing under Section 32 because it is an exclusive licensee of the 5-hour Energy trademarks and therefore not the registrant of record or the owner of the marks, nor in a position equivalent to an assignee. This order disagrees.

The second amended complaint does not allege that Innovation Ventures is a "registrant" or "owner" of the trademarks-in-suit. Rather, the second amended complaint alleges that "Innovation Ventures is the worldwide exclusive licensee of the" trademarks (as well as the copyrights and trade dress at issue in this suit) (Dkt. No. 95 ¶¶ 15, 18).

Pitco has appended an assignment agreement between International IP and Innovation Ventures, and an exclusive license agreement between the same parties to its motion to dismiss (Dkt. Nos. 157-1, 157-2). It is appropriate for this order to consider these two extrinsic items under the incorporation-by-reference rule because their authenticity is not contested and the complaint necessarily relies upon them. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006).

The extrinsic evidence shows that Innovation Ventures is an exclusive licensee of the 5-hour Energy marks owned by International IP. Under the assignment agreement, Innovation Ventures (the original registrant), had assigned title in the marks to International IP, a mere holding company. International IP and Innovation Ventures then executed a license-back agreement making Innovation Ventures its exclusive licensee and granting Innovation Ventures the right to sue for infringement in its own name. In the context of trademark licensing law, the validity of this type of assignment and license-back transaction is well-settled. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992); *Visa, U.S.A., Inc. v.*

*Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 1377 (Fed. Cir. 1982), *cert. denied*, 464 U.S. 826 (1983).

Innovation Ventures argues that this exclusive license was functionally equivalent to an assignment and thereby created standing to sue. Pitco contends that an exclusive licensee lacks standing under Section 32 when the contract provisions demonstrate that the registrant retains exclusive ownership of the mark.

It is helpful to distinguish between exclusive licenses and assignments at the outset.

> While the terms, "assignment," "exclusive license," and "license" are frequently used by courts and practitioners interchangeably, the differences are significant. An assignment passes legal and equitable title to the property while a license is mere permission to use. Assignment is the transfer of the whole of the interest in the right while in a license the owner retains the legal ownership of the property.

*Presley's Estate v. Russen*, 513 F. Supp. 1339, 1350 (D.N.J. 1981). Phrased differently, "an 'assignment' of a mark . . . is an outright sale of all rights in that mark, [and] a 'license' of a mark . . . is a limited permit to another to use the mark." 3 *McCarthy on Trademarks and Unfair Competition* § 18:1 (4th ed.).

There is a split in authority regarding whether an exclusive licensee of a federal trademark can have standing to sue under Section 32. One rule strictly construes the statute as applying to registrants (and thus owners) of federal trademarks. 6 *McCarthy on Trademarks and Unfair Competition* § 32:3 (4th ed.); *see, e.g., DEP Corp. V. Interstate Cigar Co., Inc.*, 622 F.2d 621, 622–23 (2d Cir. 1980). Under this approach, Innovation Ventures lacks standing.

On the other side of the split, some courts have concluded that, "[s]tanding may exist where the licensing agreement both grants an exclusive license and grants to the exclusive licensee a property interest in the trademark, *or rights that amount to those of an assignee*." *Visa U.S.A., Inc. v. First Data Corp.*, No. C 02-01786, 2005 WL 6271242, at *3 (N.D. Cal. Aug. 16, 2005) (Judge Jeffrey White) (emphasis added), citing *Ultrapure Sys. v. Ham-Let Group*, 921 F. Supp. 659 (N.D. Cal. 1996) (Judge Spencer Williams). "A truly exclusive licensee, one who has the right even to exclude his licensor from using the mark might be considered an assignee since no right to use the mark is reserved to the licensor." *ICEE Distribs., Inc. v. J&J Snack Foods.*

4

*Corp.*, 325 F.3d 586, 598 (5th Cir. 2003), *citing Fin. Inv. Co. (Bermuda) Ltd. V. Geberit AG*, 165 F.3d 526, 531–32 (7th Cir. 1998). Although our court of appeals has not yet spoken, district courts in this circuit generally have applied the latter approach.

This order holds that the latter view is more consistent with congressional intent, and therefore should be applied. The ex parte seizure remedy in 15 U.S.C. 1116 was added to the Lanham Act as part of the Trademark Counterfeiting Act of 1984. The express purpose of the Act was to provide increased sanctions for the counterfeiting "of certain *registered* trademarks." H.R. Rep. No. 98-997 at 4 (1984) (emphasis added). Congress was particularly concerned about counterfeiting of Olympic marks, but the House report also cites the "serious and growing problem" of counterfeiting of such diverse items as designer clothing, cosmetics, pharmaceuticals, heart pacemakers, and aircraft parts. *Id*. at 6. This concern was not only due to economic loss, but to the "grave risks to the health and safety of consumers" presented by counterfeits. *Ibid*.

The legislative history refers to "registrants" and owners; it does not address the stature of an exclusive licensee. It is clear, however, that the purpose of the statute was to "strengthen existing laws on trademark counterfeiting" because the existing Lanham Act protections were inadequate. *Ibid*. Courts applying the *Ultrapure* rule recognize that an exclusive licensee may be the real party in interest in a counterfeiting suit, and thus the party that should wield the anti-counterfeiting remedy.

Defendants contend that the structure of the Lanham Act indicates that Congress intended to restrict the ex parte remedy in Section 32 to registrants/owners, while granting the remedies under Section 43 to registrants and licensees alike. Although this separation of remedies exists in the Lanham Act, it does not follow that *exclusive* licensees should be lumped together with licensees. There is no necessary connection between licensees and exclusive licensees in the text of the statute.

This argument is also contradicted by the legislative history. Congress intended the ex parte seizure remedy to protect "registered" marks under Section 32. H.R. Rep. No. 98-997 at 4 (1984). Unregistered marks, in contrast, are protected under Section 43. *Two Pesos, Inc. v.*

5

*Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Preventing exclusive licensees who are functionally equivalent to owners of registered marks from protecting their products would foil the purpose of the ex parte seizure provision.

Defendants contended during oral argument that an ex parte seizure order is a drastic and extraordinary remedy. The legislative history demonstrates that Congress was indeed concerned with the dangers of seizure orders. The main solution, however, was not to place limits on the party that could assert the remedy. Rather, Congress implemented a comprehensive set of provisions that provided for due process, limited the scope of such seizures, and established substantial remedies for wrongful and bad faith seizure actions. *See* H.R. Rep. No. 98-997 at 15–26 (1984). It does not follow that Congress also intended to limit the availability of this drastic remedy by preventing an exclusive licensee that is the *de facto* owner of the mark from using it.

During oral argument, plaintiffs pointed out that in the patent context an exclusive licensee is treated as an assignee for standing purposes. Strictly speaking, the text of 35 U.S.C. 281 reserves standing to a "patentee," defined as the person "to whom the patent was issued [and] . . . the successors in title to the patentee." 35 U.S.C. 100(d). Despite this seemingly clear language, the Supreme Court long ago held that the transfer of "the exclusive right to make, use and vend the invention . . . is an assignment, properly speaking" for standing purposes. *Waterman v. Mackenzie*, 138 U.S. 252, 255, (1891). More recently, the Federal Circuit, again in the patent context, held:

> We agree that there is no substantive difference between the property interests of an assignee and of an exclusive licensee who has been granted all substantial patent rights including the right to exclude the patentee. Although it would be more accurate to preserve the distinction whereby the term "assignment" is reserved for transfers that include nominal title, we agree with precedent that when the transfer includes all substantial patent rights including the right to exclude the transferor, there is no significant difference between the rights transferred by assignment and those transferred by exclusive license.

*McNeilab, Inc. v. Scandipharm, Inc.*, 95 F.3d 1164, at *5 (Fed. Cir. 1996) (table). Similarly, in the copyright context, courts have observed that "[t]he differences between an 'exclusive' license and an assignment or transfer of copyright ownership interest have diminished to the

6

point that the terms are nearly synonymous." *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982).

The Ultrapure approach followed by district courts in our circuit has been generally true, by analogy, to the patent law expressed in *McNeilab*: a truly exclusive license that grants *all* substantial trademark rights, including the ability to exclude the licensor from using the marks, is tantamount to an assignment for standing purposes. Such a license would have no significant differences from an assignment, and the exclusive licensee would likely be the real party in interest in a trademark suit.

True, patents, copyrights, and trademarks are different creatures. "Unlike patents or copyrights, trademarks are not separate property rights. They are integral and inseparable elements of the goodwill of the business or services to which they pertain." *Visa, U.S.A., Inc. V. Birmingham Trust Nat. Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982). But this difference in kind does not make the exclusive licensee of a patent different from the exclusive licensee of a trademark. A properly worded exclusive licensee can be the functional equivalent of an assignment in either domain.

The next question is whether Innovation Ventures' exclusive license was tantamount to an assignment. Here, the rights conveyed appear substantial. International IP granted Innovation Ventures "an exclusive, worldwide license to the Intellectual Property including, but not limited to, the exclusive right to use, make, have made, import, offer to sell, and sell any product or process including the right to sublicense in the United States and throughout the world" (Dkt. No. 157-2 ¶ 2.1). The license broadly defines "Intellectual Property" to include not only International IP's trademarks, but also all:

> "copyrights, patents or patent applications . . . trade dress, service marks, trade names, domain names, brand names, corporate names, designs, logos, emblems, signs or insignia, slogans, other similar designations of source or origin and general intangibles of like nature, together with goodwill of the business, trade secrets, and know-how, each of which whether owned by Licensor, in part or in whole, or developed by Licensor or on Licensor's behalf, now or arising in the future"

7

(*Id*. ¶ 1.1). International IP thus lost its ability to use the trademarks in any way. Innovation Ventures also received the right to sue for infringement and the right to compel International IP to join in a lawsuit (*Id*. ¶¶ 2.3, 5.2).

The rights retained by International IP were few. There is a supervision clause in paragraph 2.2 that gave International IP the right to inspect Innovation Ventures' use of the marks in order to maintain quality control. This type of supervision clause, however, is a required feature of any valid trademark license. *See* 3 *McCarthy on Trademarks and Unfair Competition* § 18:42 (4th ed.).

International IP also retained a slice of control over litigation. Defendants contend Innovation Ventures' control over lawsuits is illusory because the agreement states that Innovation Ventures "may not settle [a] lawsuit/proceeding if the settlement includes admissions of patent invalidity or other matters that adversely affect the viability of any of the Intellectual Property unless previously agreed to by the Parties" (Reply 6, *citing* Dkt. No. 157-2 ¶ 5.5). This provision prevents the licensee from destroying the legal title retained by the licensor via a settlement. It is a narrow limitation that does not render Innovation Ventures' overall control of litigation illusory. More fundamentally, this limitation does not, as a practical matter, alter Innovation Ventures' status as the party that controls the exploitation of the intellectual property.

The structure of the transaction executed between International IP and Innovation Ventures is also significant. As noted above, the validity of assignments and reciprocal license grant-backs is well-established. Our court of appeals has expressly approved of them in the licensing context when they effect the purposes of trademark law by "bringing commercial reality into congruence with customer perceptions." *See E. & J. Gallo*, 967 F. 2d at 1290. Requiring the presence of the assignor for standing in an action under Section 32 can be addressed by joining the holding company as a plaintiff (and there is no dispute that International IP has standing in this action).

On this record, it is a close call whether "all" significant rights to the trademarks-in-suit were granted. Clearly, some rights were retained. This order declines to rule on the ultimate issue on a Rule 12 motion. The record is too thin to answer questions regarding how plaintiffs

8

contractual arrangement has operated in practice, the extent of the control actually exercised by the licensor, and the intent of the parties at the time of the assignment and license-back transaction. This will be an issue for trial and discovery thereon is hereby permitted.

Defendants' motion to dismiss claims I and II is accordingly **DENIED**.

### 2. THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR CONTRIBUTORY INFRINGEMENT.

Pitco contends that the allegations in the second amended complaint do not give rise to a plausible inference that Pitco intentionally or knowingly contributed to trademark infringement, or that it was willfully blind to evidence of infringement. This order disagrees.

Plaintiffs cite the allegations in paragraphs 10 and 11 of the second amended complaint referring to an email sent by an authorized broker of Living Essentials to a Pitco employee stating that the broker could not "verify that the Berry & Extra Strength Berry 5-hour Energy being sold by Pitco Foods is authentic 5-hour Energy product" (Dkt No. 95 ¶ 10). Plaintiffs also allege that in response "Pitco falsely told the broker that the only supplier from whom it had ever purchased 5-hour Energy was Living Essentials itself" when it was in fact purchasing substantial quantities from another defendant in this action (Dkt. No. 95 ¶ 11).

Defendants point out that a prior order stated that Pitco's purchase of the counterfeit bottles "was not an intentional act" (Dkt. No. 75 at 1). A separate order held that the broker emails relied on by plaintiffs "do not demonstrate that Pitco Foods 'acted with, at a minimum, willful blindness and brazen mendacity in connection with the counterfeits at issue in this case' as plaintiffs contend" (Dkt. No. 116 at 6). Defendants concede that these prior holdings at the preliminary injunction phase are not dispositive here.

It is not necessary to consider the persuasive value, if any, of these prior findings regarding intentionality and willful blindness. When viewed in the light most favorable to plaintiffs, the alleged false statement and the surrounding context give rise to a plausible inference that Pitco knowingly contributed to trademark infringement. This suffices for the purposes of the present motions to dismiss. Defendants' motion to dismiss plaintiffs' contributory infringement claim is **DENIED**.

9

### 3. THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR UNFAIR COMPETITION.

Defendants contend that plaintiffs' claim IX for unfair competition under Section 17200 should be dismissed because plaintiffs do not allege facts establishing they are entitled to any remedy under the statute. This order finds that plaintiffs have alleged facts establishing they may be entitled to restitution. Defendants' motion to dismiss the Section 17200 claim is therefore **DENIED**.

Restitution under Section 17200 is limited to either (1) "money or property that defendants took directly from plaintiff" or (2) "money or property in which [plaintiff] has a vested interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003). Plaintiffs have not alleged that Pitco has any money or property that was once in their possession. Instead, plaintiffs claim they have a "vested interest in the profits of Pitco's infringement," and seek "Pitco's profit from each infringing sale" (Opp. 15).

On the subjects of restitution and vested interests, the California Supreme Court has explained:

> In *Cortez*, we determined that "earned wages that are due and payable pursuant to section 200 *et seq.* of the Labor Code are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice." Therefore, we concluded that such wages could be recovered as restitution under . . . [Section 17200]. We reached this result because "equity regards that which ought to have been done as done, and thus recognizes equitable conversion."

*Ibid.*, citing *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163 (2000). In *Korea Supply*, a defense contractor with the lowest bid on a Korean government contract lost the contract to a competitor that paid a bribe. *Korea Supply* distinguished the interest in *Cortez* in wages-earned from the attenuated expectancy in an unfulfilled contract. "Such an attenuated expectancy cannot . . . be likened to 'property' converted by [defendant] that can now be the subject of a constructive trust. To create a constructive trust, there must be a res, an 'identifiable kind of property or entitlement in defendant's hands.'" *Id.* at 1150.

10

Typically, profits earned from unfair business practices do not constitute money taken directly from the plaintiff, nor money in which a plaintiff has a vested interest. Here, however, each challenged sale involved a product allegedly embodying plaintiffs' intellectual property. Using the framework of *Korea Supply* and *Cortez*, the 'work' done by the trademark is identifying the origin and quality of a product in the eyes of a consumer. In that sense, a counterfeiter profits from the 'work' performed by the trademark owner's property.

The sale of a counterfeit is also analogous to the sale of a res. By selling the counterfeits, an alleged infringer is both selling the trademark owners' property, and damaging the owner's property interest in its accumulated goodwill by putting inferior products in the stream of commerce. Just as a copyright owner acquires an equitable interest in an infringing work as soon as it is made, and which attaches to any profits from its exploitation, *cf. Los Angeles News. Serv. v. Reuters Television. Int'l, Ltd.*, 149 F.3d 987, 991 (9th Cir. 1998), so too does a trademark owner acquire an equitable interest in a counterfeit product. It is also noteworthy here that the second amended complaint pleads a claim for copyright infringement (claim VII).

Neither party has identified binding authority on this question. Plaintiffs cite only one trademark decision: *MGA Entm't, Inc. v. Mattel, Inc.*, No. CV 05-2727 NM, 2005 WL 5894689, at *9 (C.D. Cal. Aug. 26, 2005) (Judge Nora Manella). *Mattel* refused to dismiss at the pleadings stage in part because it was too early to determine whether the plaintiff might be entitled to restitution. *Ibid*. Plaintiffs also cite several decisions in other areas of intellectual property law where infringement was a potential source for restitution under Section 17200.

The only trademark decision relied on by defendants, *Lee Myles Assocs. Corp. v. Paul Rubke Enters., Inc.*, 557 F. Supp. 2d 1134 (S.D. Cal. 2008), is not on point. That decision involved an auto repair franchisee accused of failing to pay royalties for the use of the franchisor's trademarks. The service being provided in *Lee Myles* did not itself embody the intellectual property at issue and did not have the added element of putting an inferior product into the stream of commerce.

11

Plaintiffs' allegations are sufficient — at the pleading stage — to state a claim for a vested interest in the counterfeit products for the purposes of Section 17200. It is therefore unnecessary at this time to determine whether plaintiffs have also adequately alleged facts supporting their request for an injunction. It will be best to decide the reach of Section 17200 restitution after the facts are presented at trial.

### 4. THE CLAIM FOR UNJUST ENRICHMENT IS DISMISSED.

Plaintiffs' claim XI for relief is "common law unjust enrichment." Unjust enrichment is not a stand-alone claim in California." *Am. Exp., F.S.B., Fed. Sav. Bank v. Wright*, C 11-04492 WHA, 2012 WL 2343674, at *4 (N.D. Cal. June 20, 2012) (*citing McKell v. Wash. Mut. Inc.*, 142 Cal. App. 4th 1457, 1490 (2006)). The decisions cited by plaintiffs to the contrary all pre-date *McKell* and are not persuasive. Plaintiffs also suggest that the putative unjust enrichment claim could be restyled as a claim for restitution, quasi-contract, or imposition of a constructive trust. They may attempt to do so by amending the complaint; until then, as to all defendants the claim is **DISMISSED**.

### CONCLUSION

Pitco's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Claims I and II in the second amended complaint, to the extent they are asserted by Living Essentials, are **DISMISSED**. Pitco's contention in a footnote (Br. 7 n.3) that claim III should be dismissed due to a lack of standing was not briefed by the parties and is **DENIED** without prejudice. Claim XI is **DISMISSED**. Pitco's motion is otherwise **DENIED**.

United Custom's joinder in Pitco's motion to dismiss plaintiffs' claims I, II, and XI is **GRANTED** to the same extent as Pitco's motion. For all other purposes United Custom's joinder motion is **DENIED**.

Plaintiffs may seek leave to amend and will have until **MARCH 29 AT NOON** to file a motion, noticed on the normal 35-day track, for leave to file an amended complaint. A proposed amended complaint and a redline of changes must be appended to the motion. The motion

should clearly explain how the amendments to the complaint cure the deficiencies identified herein. If no such motion is timely made, then answers will be due within twenty days from March 29.

**IT IS SO ORDERED.**

Dated: March 11, 2013.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE